STAR RESTAURANT *v.* METROPOLITAN LIFE INSURANCE COMPANY.

October Term, 1932.

Present:   POWERS, C. J., SLACK, MOULTON, THOMPSON, and GRAHAM, JJ.

Opinion filed January 4, 1933.

*Austin & Edmunds* for the plaintiffs.

*Theo. E. Hopkins* for the defendant.

80

SLACK, J. The declaration contains two counts. The first is predicated upon the fraudulent conduct of defendant's agent, J. F. O'Day, hereafter set forth, and the second is predicated upon the negligence of defendant in failing to discover O'Day's acts in time to have prevented the injury to the plaintiffs. The case was heard on an agreed statement of facts; judgment was for the defendant, and the case is here on plaintiffs' exceptions.

The facts material under the first count are, in substance, these: The plaintiffs are a copartnership doing business at Burlington, Vermont. The defendant is a corporation engaged in the life insurance business. Its main office is in New York City, and it has numerous district offices throughout the United States and Canada, one of which is located in Burlington. O'Day was agent for defendant in the Burlington office from September 1, 1929, to June 30, 1931. As such agent he had authority to solicit insurance in the defendant company in Burlington and vicinity, receive from policyholders for cash payments on policies, receive requests, in writing, for loans on policies together with the policies, collect for and pay to de-

fendant all premiums on policies, repayments of loans, and other monies that might be due from policyholders on any account, secure for policyholders forms and blanks for applications for insurance, loans, cash surrender values, and change of plan of insurance, and deliver to them policies, premium receipts, check payable by defendant to them on any account, and all other papers delivered to him by defendant for that purpose. In none of the transactions did O'Day deal directly with defendant's home office. All papers and monies received by him from policyholders he turned over to the Burlington office, and all papers and checks for policyholders were sent to him by the main office through the Burlington office. The defendant had a rule that its agents should not cash for payees checks issued to them for any purpose. This rule was for the benefit of the defendant and its policyholders, and not for the protection of the general public. If a policyholder desired a loan on his policy the application therefor, and the policy, were delivered to O'Day, who transmitted them through the Burlington office to the home office. If the loan was made, the home office indorsed on the policy the fact of the loan and the assignment of the policy to it as security therefor, and returned the policy together with a check payable to the order of the policyholder for the amount of the loan to the Burlington office to be by it turned over to O'Day for delivery to the policyholder. Between October 1, 1929, and June 15, 1931, the defendant drew seventy-one different checks on the Chase National Bank, payable to the order of various policyholders in its Burlington district and sent them to the Burlington office to be delivered by O'Day to the payees named in such checks, and they were turned over to him for that purpose. Instead of delivering them to the rightful parties, he forged the name of the payee that appeared in each check on the back thereof and procured the cash thereon from the plaintiffs. The aggregate amount that O'Day obtained in this manner was approximately $4,900. The plaintiffs deposited these checks in the Howard National Bank of Burlington, and were given credit therefor, but after the forgeries were discovered they were charged back to plaintiffs and deducted from their account.

The plaintiffs did not request O'Day to indorse any of these checks, and he did not indorse them. They did not request him to prove the genuineness of the indorsements thereon, but re-

lied on his representations that the names of the payees appearing on the backs of such checks were genuine. O'Day frequently patronized plaintiffs' restaurant while he was agent for defendant, and they knew that he was such agent. He sold insurance in defendant's company to, and collected premiums from, some of plaintiff's employees, but whether they knew such facts does not appear.

The plaintiffs insist that these facts bring the case within the doctrine of *Greenough* v. *United States Insurance Company*, 96 Vt. 47, 117 Atl. 332, 334, and entitle them to a judgment under the first count in the declaration. That case is unlike this one in a most essential feature. There the act of the agent in procuring the bond was not only within the scope of his employment, an act which he was authorized to do, but as is pointed out the act was in the furtherance of the principal's business. So, too, the act of the agent in *Ploof* v. *Putnam*, 83 Vt. 252, 75 Atl. 277, 26 L. R. A. (N. S.) 251, 138 A. S. R. 1085, and *Gutzwiller*, v. *American Tobacco Company*, 97 Vt. 281, 122 Atl. 586, for which the principal was held liable was committed in endeavoring to promote the principal's business. Much of the confusion and conflict in the cases is due to a failure to note the distinction between acts done by an agent within the scope and course of his employment, and acts done merely during his employment. In order to render the principal liable for the agent's torts, they must have been committed while carrying out the principal's business. Broadly stated, the tort of an agent is within the course of his employment when in performing it he *is endeavoring to promote the principal's business* within the scope of the actual or apparent authority conferred upon him for that purpose. But if the agent steps aside from the principal's business, for however short a time, to do acts not connected with such business, the relation of agency is for that time suspended, and the agent is not acting within the scope of his employment. 2 C. J. p. 853, and cases cited. It is apparent that O'Day was not acting in the furtherance of, or in endeavoring to promote, defendant's business, when he forged these checks.

Much stress is laid on the closing language in the Greenough Case, where, it is said that "it is more reasonable, when one of two innocent persons must suffer from the wrongful act of a third person, that the principal who has placed the agent in a

position of trust and confidence should suffer, than a stranger.'' This language was used, and should be read, in the light of the circumstances there appearing. When so read it ought not to be misleading. Standing alone it is clearly open to the criticism of Mr. Mechem in his work on Agency (2nd ed.) where he says, at par. 1586: ''Like many other alleged maxims, this one contains only a half truth at most, and its use seems to be resorted to only to cover loose reasoning or to span a gap without noticing it.'' No one, no lawyer, at least, ever understood that the mere fact that a person made it possible for another to commit a wrongful act bound him for such acts of the latter. On the agreed facts, a recovery cannot be had under this count.

■■ The facts material under the count for negligence, in addition to those stated above, are these: Forty-two of the checks already mentioned were issued for loans on policies on applications forged by O'Day, and he also forged eleven other like applications and fifteen other checks during the summer and fall of 1930. The latter checks were indorsed by him and deposited in the Chittenden County Trust Company of Burlington. The defendant had in its home office the applications for the policies on which loans were made which bore the genuine signatures of the different holders. The defendant had more then twenty thousand employees in its district offices. Its employees in its home office who handled the cancelled check here in issue, and the vouchers for the same, were not acquainted with O'Day's signature and were not familiar with his name as an agent in the Burlington district.

O'Day's procedure respecting loans on policies was this: He obtained the policy from the holder on the representation that the home office desired it for some purpose, he then forged the application and delivered both policy and application to the Burlington office which sent them to the home office. If the loan was made, the home office made the indorsement on the policy and returned the policy together with a check for the amount of the loan, to the Burlington office, in the manner and for the purpose above stated; when O'Day received these papers he pasted over the indorsement made on the policy by the home office a designation form, so-called, which stated the district and debit number to which the policy belonged and returned the policy in that form to the holder, and retained the check and forged the payee's signature thereon. Early in June, 1931, de-

fendant wrote one McGrath about a supposed loan and learned from her that she had not received a loan or made application for one. An investigation of O'Day's transactions followed, when his forgeries were for the first time discovered by defendant.

Unless we are bound to hold that the foregoing facts establish defendant's negligence as a matter of law, the plaintiffs are not entitled to recover under this count. This we cannot do. While the fact that such a large number of forgeries escaped detection is a circumstance in plaintiffs' favor, it is *only a circumstance* which *tended* to show *negligence* on the part of the defendant. So far as the forged applications for loans on policies are concerned, it should be remembered that the policy in each instance accompanied the application, which fact of itself indicated that the application was genuine. Since this is so, it cannot be said as a matter of law that defendant was negligent in failing to compare the signatures on such applications with those on the applications for the policies. Moreover, it does not appear that such a comparison would have disclosed the forgeries.

Neither can it be said as a matter of law that defendant was negligent in failing to discover the forged checks. Breaches of trust unfortunately are not infrequent, but they are so few among the great number of employees who merit confidence that a principal is not chargeable with negligence in failing to discover that the agent has gone astray unless and until something occurs to put the principal upon inquiry. By no other rule could the vast amount of business necessarily carried on through agents be transacted. There was nothing here to put the defendant upon inquiry. These checks were returned to its home office in the regular course of business, each bore what purported to be the indorsement of the payee named therein, and, as far as appears, defendant had no reason to suspect, until the McGrath exposure, that the several persons to whom such checks were payable had not actually received the proceeds of same. The "prudent man rule" did not require the defendant to have in its home office persons to handle the return checks who were familiar with the signatures of each of twenty odd thousand agents and its policyholders. This was impossible.

The plaintiff says that the promulgation by defendant of the rule that its agents should not cash checks of the policyholders

"was evidence of recognition by it of what constituted negligence." This claim has no force in the circumstances here presented.

*Judgment affirmed.*