2004 VT 37

# Jane Doe v. Gary Forrest, Richard Forrest, Bennington County Sheriff's Department, County of Bennington and State of Vermont

[853 A.2d 48]

No. 02-184

Present: Amestoy, C.J., Dooley, Johnson and Skoglund, JJ., and Gibson, J. (Ret.), Specially Assigned

Opinion Filed May 7, 2004
Motion for Reargument Denied May 28, 2004

*David Putter*, Montpelier, and *Bradley Myerson*, Manchester Center, for Plaintiff-Appellant.

*Pietro J. Lynn* and *Heather E. Thomas* of *Lynn & Associates, P.C.*, Burlington, for Defendants-Appellees.

¶ 1. **Dooley, J.** This case requires the Court to determine whether a sheriff can be held liable as the employer of a deputy who perpetrates intentional criminal misconduct while on duty. Plaintiff-victim was coerced into performing oral sex by then-Bennington County Deputy Sheriff Richard Forrest (Forrest). Forrest voluntarily pled nolo contendere to charges of lewd and lascivious behavior in violation of 13 V.S.A. § 2601 and neglect of duty in violation of 13 V.S.A. § 3006. Plaintiff subsequently filed a civil action against Forrest's employers,

Bennington County Sheriff Gary Forrest (Sheriff Forrest) and Bennington County Sheriff's Department (collectively the defendants),[1] asserting several claims of vicarious liability for the injuries she suffered as a result of Forrest's criminal conduct. Forrest was initially a named defendant, but plaintiff voluntarily dismissed him from the case because of his lack of assets. The Bennington Superior Court granted defendants' motion for summary judgment and dismissed plaintiff's claims. Plaintiff now appeals to this Court, alleging that the court improperly granted summary judgment for defendants on several theories of direct and vicarious liability. We hold that, on the record evidence, the trial court correctly ruled that defendants are not directly liable for Forrest's misconduct under 24 V.S.A. § 309, and that summary judgment for defendants was proper on two of plaintiff's theories of vicarious liability. We also hold that there is sufficient evidence to withstand the summary judgment motion on plaintiff's theory of vicarious liability under Restatement (Second) of Agency § 219(2)(d) (1958), and reverse and remand.

¶ 2. On December 21, 1997, plaintiff, then twenty years old, was working alone as a cashier at a convenience store in East Dorset, Vermont. Forrest, who was on duty and wearing his department-issued uniform, badge, gun, and handcuffs, entered the convenience store between 8:00 p.m. and 9:00 p.m. This was Forrest's third visit to the store since 6:30 p.m. that evening. Although this particular stop was not prompted by a specific request, Forrest routinely checked the store during his East Dorset patrol as part of his "community policing function," pursuant to a contract between the Bennington County Sheriff's Department and the Town of East Dorset. As such, he had become familiar with several of the store's employees and developed something of a personal relationship with plaintiff. During some of these routine checks, Forrest jokingly threatened to handcuff or ticket plaintiff. He also bragged about his exploits as a police officer and that he was trained to "shoot to kill." In the weeks preceding December 21, his routine checks at the store increased in frequency and duration, as he apparently became more personally interested in plaintiff.

¶ 3. When Forrest entered the store, plaintiff was on the telephone with her mother while attending to customers at the check-out counter. After those customers left the store, he took the telephone from plaintiff and jokingly told her mother, who was also an employee

---

[1] Plaintiff also sued Bennington County and the State of Vermont, but the case against these defendants was dismissed, and plaintiff has not appealed this dismissal.

of the store, to stop harassing plaintiff. Forrest then hung up the telephone and began asking plaintiff questions that were sexual in nature. He turned the store's thermostat to ninety degrees and informed her that he had done so. As she was readjusting the thermostat, he took hold of her hair, which was in a ponytail, and used it to move her head in various directions. He told her that he liked women who wore their hair in a ponytail so that he could control them. He then put his arm around plaintiff, who said nothing, but moved away from him and returned to the check-out counter.

¶ 4. Forrest then selected an adult magazine from the store's magazine rack and showed plaintiff a picture of a woman performing fellatio. After a short conversation pertaining to the sexual act depicted in the magazine, he began to maneuver her into a secluded area of the store, where he coerced her to perform oral sex. He also kissed and fondled her breasts. After approximately fifteen minutes, she moved away from Forrest, who departed soon thereafter. She then telephoned for help. Forrest did not during the sexual assault unholster his weapon or handcuffs, nor did he threaten to use either instrument on plaintiff.

¶ 5. As a result of the incident, Forrest resigned from the Sheriff's Department. Following an investigation by the Vermont State Police, he was charged with, and voluntarily pled nolo contendere to, a criminal charge of lewd and lascivious behavior for exposing and "causing his penis to contact the mouth of [plaintiff] in violation of 13 V.S.A. § 2601." He also pled nolo contendere to a charge of neglect of duty for engaging in "open and gross lewd and lascivious conduct with [plaintiff] while assigned to patrol duty in violation of 13 V.S.A. § 3006." He was sentenced to three-to-five-years' imprisonment, all suspended, and was placed on probation and ordered to have no contact with plaintiff or her family.

¶ 6. Plaintiff filed suit against defendants, alleging various state and federal claims and seeking monetary damages for injuries she suffered as a result of Forrest's conduct. After plaintiff voluntarily dismissed all federal claims, defendants moved to dismiss her state law claims, arguing that an employee's intentional sexual misconduct could not be imputed to an employer because such conduct is beyond the scope of employment. Finding further discovery warranted, the trial court denied defendants' motion to dismiss.

¶ 7. After approximately two years of discovery, defendants moved for summary judgment, reasserting their argument that Forrest's misconduct was not within the scope of his employment; that no theory

of vicarious liability recognized in Vermont would impute Forrest's conduct to defendants; and that there was no evidence to indicate that Sheriff Forrest had negligently trained Deputy Forrest, or that Sheriff Forrest knew or should have known that Deputy Forrest had a propensity to assault women.

¶ 8. Following a hearing, the court granted defendants' motion. The court found that 24 V.S.A. § 309, which plaintiff asserted was a basis for liability, was not applicable; that based on the undisputed material facts defendants were not vicariously liable under the doctrine of respondeat superior or alternative theories of liability under the Restatement (Second) of Agency § 219(2)(d); and that there was no evidence indicating defendants had negligently supervised Forrest. The court then entered judgment in favor of defendants. This appeal followed.

¶ 9. Our review of summary judgment is de novo, and in proceeding with that review, this Court applies the same standard as the trial court. *Springfield Terminal Ry. v. Agency of Transp.*, 174 Vt. 341, 344, 816 A.2d 448, 452 (2002). We will affirm summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . . show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." V.R.C.P. 56(c)(3); *King v. Gorczyk*, 2003 VT 34, ¶ 7, 175 Vt. 220, 825 A.2d 16. In applying this standard, we give the nonmoving party the benefit of all reasonable doubts and inferences. *King*, 2003 VT 34, at ¶ 7. Summary judgment is required when, after adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an element essential to her case upon which she has the burden of proof. *Poplaski v. Lamphere*, 152 Vt. 251, 254-55, 565 A.2d 1326, 1329 (1989). Plaintiff asserts several arguments on appeal in support of her contention that the trial court erred in granting defendants' motion for summary judgment. Plaintiff argues that: (1) defendants are directly liable for Forrest's misconduct pursuant to 24 V.S.A. § 309 because Forrest neglected his duty when he failed to arrest himself for his own sexual misconduct; (2) Forrest's intentional criminal act was within the scope of his employment, even though that conduct was contrary to the wishes and/or instructions of defendants; and (3) defendants are vicariously liable under the Restatement (Second) of Agency § 219(2)(d) even if Forrest's acts were outside the scope of his employment. We address each of plaintiff's arguments in turn.

## I. *Direct Liability Under 24 V.S.A. § 309*

¶ 10. Plaintiff alleges that Sheriff Forrest is directly liable for Deputy Forrest's misconduct under 24 V.S.A. § 309, and that the trial court failed to accord proper weight to Forrest's neglect-of-duty conviction when assessing defendants' liability under § 309. Section 309 provides that:

> A sheriff shall be liable for the *official acts and neglects of his deputies,* and may take bonds of indemnity from them. Such deputies may, and when required, shall perform any official duty which may be required of the sheriff. Returns of their acts and doings shall be signed by them as deputy sheriffs, and their official acts shall be deemed to be the acts of the sheriff.

(emphasis added). Traditionally, § 309 and the statutes upon which the current version is based have been applied to hold sheriffs liable for their deputies' negligent or malfeasant execution of writs. See *Lyman v. Holmes*, 88 Vt. 431, 432, 92 A. 829, 830 (1915) (sheriff liable for deputy's malfeasant seizure of property on writ against another party); *Cowdery v. Smith*, 50 Vt. 235, 235 (1877) (plaintiff sued sheriff to recover for deputy's negligent failure to levy writ of execution); *Buck v. Ashley*, 37 Vt. 475, 477 (1865) (sheriff may be liable for deputy's negligent maintenance of attached property); *Flanagan v. Hoyt*, 36 Vt. 565, 571-72 (1864) (sheriff not liable for deputy's sale of attached property done in accordance with law and without sheriff's knowledge or consent); *Charles Kimball & Co. v. Perry*, 15 Vt. 414, 421 (1843) (sheriff not liable for deputy's sale of attached goods following direction by creditors' attorney because conduct not official); *Wetherby v. Foster*, 5 Vt. 136, 138 (1832) (sheriff liable for neglect of deputy to levy an execution upon personal property).

¶ 11. Apparently, plaintiff concedes that Forrest's actions cannot be considered "official acts" as those words are used in the statute. Instead, plaintiff argues that Forrest's actions represent a neglect of duty because he failed to intervene to prevent his own crime. In support of this argument, plaintiff points particularly to the fact that Forrest was convicted of neglect of duty in violation of 13 V.S.A. § 3006.

¶ 12. Because Forrest's duties cannot be construed to include committing a sexual assault, we cannot conclude that the misconduct

involved in this litigation supports plaintiff's novel theory. If, for example, the damages sought resulted from the robbing of another store while Forrest was engaged in sexual misconduct and not performing his duties, plaintiff's theory would better fit the statutory language.

■ ¶ 13. While Forrest's failure to prevent his own criminal acts may in some sense constitute "neglect" because a sheriff has the statutory duty to "suppress ... unlawful disorder," 24 V.S.A. § 299, we do not believe that, reasonably construed, § 309 applies in these circumstances. See *Springfield Terminal Ry.*, 174 Vt. at 346-47, 816 A.2d at 453; *In re G.T.*, 170 Vt. 507, 517, 758 A.2d 301, 308 (2000) (Court will always avoid a statutory construction leading to absurd or irrational results). Plaintiff's interpretation would effectively render sheriffs strictly liable under the statute for all criminal misconduct of their on-duty deputies, except in the wholly implausible and unlikely event that the malfeasant deputy prevented his or her own criminal undertaking. So construed, § 309 would impose a legal duty upon sheriffs to control all volitional criminal acts of their on-duty deputies despite having "absolutely no reasonably foreseeable notice [of those acts]." *Smith v. Day*, 148 Vt. 595, 598, 538 A.2d 157, 159 (1987) (refusing to impose duty on military university to control volitional criminal acts of its students, despite having a "large degree of control over the activities of its students," because criminal acts not foreseeable). As this Court recognized in the early case of *Flanagan v. Hoyt*, 36 Vt. at 571 (interpreting statutory predecessor to 24 V.S.A. § 309), an expansive reading of § 309 may "compel sheriffs to have no deputies," or cause them to deny important services to the community, such as the community policing function that Forrest was providing before engaging in sexual acts with plaintiff.

¶ 14. Given our construction of § 309, we reject plaintiff's assertion that the trial court did not accord proper weight to Forrest's conviction for neglect of duty under 13 V.S.A. § 3006. The charge was that Forrest neglected his duty by engaging in "lewd and lascivious conduct with [plaintiff] while assigned to patrol duty." Thus, his neglect of duty was his failure to perform his assigned patrol. Forrest's failure to perform his assigned patrol is not the cause of plaintiff's damages. The conviction adds nothing to plaintiff's case.

## II. *Vicarious Liability for Conduct Within the Scope of Employment*

¶ 15. Plaintiff next contends the trial court erred in rejecting her claim that defendants are vicariously liable for Forrest's misconduct because that conduct fell within the scope of his employment. "Under the settled doctrine of respondeat superior, an employer or master is held vicariously liable for the tortious acts of an employee or servant committed during, or incidental to, the scope of employment." *Brueckner v. Norwich Univ.*, 169 Vt. 118, 122-23, 730 A.2d 1086, 1090 (1999). We have adopted the elements of scope of employment set out in Restatement (Second) of Agency § 229(1). See *id.* at 123, 730 A.2d at 1091. To establish that a servant's conduct falls within the scope of his or her employment, a plaintiff must demonstrate that the conduct:

> (a) . . . is of the kind the servant is employed to perform; (b) . . . occurs substantially within the authorized time and space limits; (c) . . . is actuated, at least in part, by a purpose to serve the master; and (d) in a case in which force is intentionally used by the servant against another . . . is not unexpectable by the master.

*Id.*; *Sweet v. Roy*, 173 Vt. 418, 430-31, 801 A.2d 694, 703-04 (2002). The conduct of an employee falls outside the scope of employment if it is "different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." Restatement (Second) of Agency § 228(2); *Sweet*, 173 Vt. at 431, 801 A.2d at 704.

¶ 16. Plaintiff asserts that Forrest's sexual misconduct satisfies all four prongs of the scope-of-employment test adopted by this Court. We need look no further than the third prong to disagree. See *Sweet*, 173 Vt. at 431-32, 801 A.2d at 704 (inquiry looks to " 'whether the acts can properly be seen as intending to advance the employer's interests' ") (quoting *McHugh v. Univ. of Vt.*, 758 F. Supp. 945, 951 (D. Vt. 1991), *aff'd*, 966 F.2d 67 (2d Cir. 1992)). Although Forrest's misconduct occurred while ostensibly on duty, we cannot conclude that coercing plaintiff to perform fellatio was conduct that was actuated, even in part, by a purpose to serve the county sheriff. The act Forrest performed is so different from the acts he was authorized to perform that we can reach this conclusion as a matter of law. See Restatement (Second) of Agency § 228, cmt. d.

¶ 17. For purposes of our analysis, we assume, as plaintiff argues, that Forrest entered the convenience store to carry out a community policing function. The event, however, forming the basis of this suit was undeniably detached from and unrelated to that role. While Forrest may have initially gone to the store to serve the purpose of his employer, his ensuing sexual misconduct cannot be found to further the goals of law enforcement. Indeed, Forrest victimized a person he was there to protect, exactly contrary to the interests of his employer.

■ ¶ 18. This case is unlike those where a law enforcement official is overly aggressive in attempting to obtain information from a suspect or in performing the arrest of a suspect. In such a situation, the tortious conduct partially implements law enforcement goals, however inappropriately. See *Brueckner*, 169 Vt. at 123, 730 A.2d at 1091 (university could be liable for tortious hazing conduct of university cadre members who "were acting in furtherance of their general duties to indoctrinate and orient" first-year students). Here, Forrest's criminal misconduct — an act rooted in prurient self-interest — cannot properly be seen as intending to advance the employer's interests.[2] The superior court properly granted summary judgment to defendants on the ground that Forrest was not acting within the scope of his employment when he sexually assaulted plaintiff.

¶ 19. Because we decide that plaintiff does not meet the third prong of the scope of employment test, we need not consider plaintiff's argument that the sexual misconduct was not unexpectable, but instead was foreseeable.

### III. *Vicarious Liability Under the Restatement (Second) of Agency § 219(2)(d)*

¶ 20. Finally, plaintiff claims that, although Forrest's sexual misconduct was outside the scope of his employment, defendants are vicariously liable for that tortious conduct, relying on the principles set forth in the Restatement (Second) of Agency § 219(2)(d). In its entirety, § 219 reads:

---

[2] Forrest's sexual misconduct also directly violated explicit Bennington County Sheriff's Department policy prohibiting sexual activities while on duty. This fact, while relevant, is not determinative in our scope of employment inquiry because "there is no requirement that the master specifically authorize the precise action the servant took." *Sweet v. Roy*, 173 Vt. 418, 432, 801 A.2d 694, 704 (2002).

When Master is Liable for Torts of His Servants

(1) A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.

(2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:

(a) the master intended the conduct or the consequences, or

(b) the master was negligent or reckless, or

(c) the conduct violated a non-delegable duty of the master, or

(d) *the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.*

(emphasis added). Plaintiff actually asserts two different theories of liability relying upon the disjunctive language in § 219(2)(d). The first clause establishes an employer's vicarious liability for the torts of employees based on the doctrine of "apparent authority," while the second creates liability for an employer whose agent "was aided in accomplishing the tort by the existence of the agency relation." *Id.* Plaintiff argues that defendants are vicariously liable under both theories.

¶ 21. This Court has not explicitly adopted § 219(2)(d) as an exception to our scope-of-employment rule, although we have recognized the provision as relevant in the context of workplace sexual harassment. See *Allen v. Dep't of Employment & Training*, 159 Vt. 286, 291, 618 A.2d 1317, 1320 (1992) (noting that standards courts have applied to impute knowledge of workplace sexual harassment to employers is in general accord with § 219(2)(d)). We have routinely adopted provisions of the Restatement (Second) of Agency as reflecting the common law of Vermont. See *Sweet*, 173 Vt. at 432-33, 801 A.2d at 704-05; *Brueckner*, 169 Vt. at 123, 730 A.2d at 1091. This section has been relied upon by the United States Supreme Court as a general statement of agency principles. See *Faragher v. City of Boca Raton*, 524 U.S. 775, 801-02 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 758 (1998). Certainly, the opening subsection, § 219(1), which states the general proposition that a master is liable for the torts of his or her servants committed while in the scope of their employment, is in accord with our current view of respondeat superior. See *Breslauer v. Fayston*

*Sch. Dist.*, 163 Vt. 416, 424, 659 A.2d 1129, 1134 (1995) (citing § 219 for the proposition that a plaintiff must show master-servant relationship to hold master vicariously liable for torts of his servant). We have also consistently recognized the doctrine of apparent authority, primarily in the context of an agent's authority to enter into a contractual relationship on behalf of the principal. See *Lakeside Equip. Corp. v. Town of Chester*, 173 Vt. 317, 324-25, 795 A.2d 1174, 1180-81 (2002) (apparent authority of agent sufficient to establish personal jurisdiction over the principal); *New England Educ. Training Serv., Inc. v. Silver Street P'ship*, 148 Vt. 99, 105, 528 A.2d 1117, 1120-21 (1987) (apparent authority recognized but not applicable because no grounds for reliance); *Blitz v. Breen*, 132 Vt. 455, 458-59, 321 A.2d 48, 50-51 (1974) (apparent authority recognized but not applicable because real estate agent did not act with principal's apparent authority to purchase land on behalf of plaintiff); *Star Rest. v. Metro. Life Ins. Co.*, 105 Vt. 77, 82, 163 A. 558, 559 (1933) (stating general rule that "the tort of an agent is within the course of his employment when . . . he is endeavoring to promote the principal's business within the scope of the actual or apparent authority") (emphasis in original omitted).

¶ 22. Thus, consistent with our previous references to § 219(2)(d), we expressly adopt this provision of the Restatement as applicable in assessing whether an employer has vicarious liability for the tortious conduct of an employee when that conduct falls outside the scope of his or her employment. As a result, we analyze both of plaintiff's arguments under this section.

### A. *Apparent Authority*

¶ 23. Plaintiff argues that, pursuant to the first clause of § 219(2)(d), defendants are vicariously liable for Forrest's sexual misconduct under the doctrine of "apparent authority" because the instruments of police power provided to Forrest, such as a gun, badge, and uniform, can "reasonably create an impression that the employer authorized the deputy to coerce sex." "As a general rule, apparent authority is relevant where the agent purports to exercise a power which he or she does not have, as distinct from where the agent threatens to misuse actual power." *Burlington Indus.*, 524 U.S. at 759. "Apparent authority 'derives from conduct of the principal, communicated or manifested to the third party, which reasonably leads the third party to rely on the agent's authority.'" *Lakeside Equip. Corp.*, 173 Vt. at 325, 795 A.2d at 1181 (quoting *New England Educ. Training Serv.*, 148 Vt. at 105, 528 A.2d at 1120). Liability under the doctrine

"exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized." Restatement (Second) of Agency § 8 cmt. c; see *Ellerth*, 524 U.S. at 759. The existence of apparent authority "depends upon a factual showing that the third party relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal — not the agent." *Hallock v. State*, 474 N.E.2d 1178, 1181 (N.Y. 1984).

¶ 24. Based on the summary judgment record, there is no evidence of conduct by Sheriff Forrest or the Bennington County Sheriff's Department communicating or manifesting Forrest's authority to engage in sexual misconduct while on duty. See *Lakeside Equip. Corp.*, 173 Vt. at 325, 795 A.2d at 1181 (no evidence on summary judgment record demonstrating that principal signaled to plaintiff that agent had authority to enter into contract). Defendants provided Forrest with the ordinary trappings of police power — a gun, badge and uniform. To hold that these items created apparent authority in this case would necessarily mean that all law enforcement officers have the apparent authority to engage in sexual misconduct. We cannot conclude that it would be reasonable for plaintiff to infer such authority from the visible manifestations of Forrest's power as a law enforcement officer or his threats, if any, to use his power on plaintiff. See *New England Educ. Training Serv.*, 148 Vt. at 105, 528 A.2d at 1120-21 ("[T]here is absolutely no evidence in the record of conduct on the part of the principal . . . which could reasonably have been relied on by plaintiff as a manifestation of the authority of its agent . . . ."). Accordingly, we conclude that summary judgment in favor of defendants on the claim of apparent authority was appropriate.

## B. *Aided in Accomplishing the Tort*

¶ 25. Finally, plaintiff argues that summary judgment was inappropriate because a question of material fact remains as to whether defendants should be held vicariously liable under the last clause of § 219(2)(d), which authorizes liability for torts committed outside the scope of the servant's employment if the servant "was aided in accomplishing the tort by the existence of the agency relation." Plaintiff argues that the agency relationship aided the commission of the tort in two ways: (1) by giving Forrest unique access to and authority over plaintiff to commit the tort; and (2) by giving Forrest

the instruments, particularly the uniform and firearm, to prevent resistance. Because we conclude there are questions of material fact regarding this issue, we reverse the trial court's grant of summary judgment on this issue.

¶ 26. At the outset, we must acknowledge that plaintiff's theories, assuming the facts support them, appear to fit squarely within the plain language of the last clause of § 219(2)(d). Plaintiff alleges that Forrest could not have committed the sexual assault on plaintiff except by virtue of the deputy sheriff position conferred on him by defendants. In the wording of the section, plaintiff's theory is that Forrest's appointment and his official powers and responsibilities "aided in accomplishing the tort" on plaintiff.

¶ 27. As is more fully developed below, however, we are convinced that we must look further than the plain language of the clause. Indeed, as is apparent from a reading of this decision, the trial court opinion and the dissent, we must first choose among conflicting interpretations of the Restatement language before we can apply § 219(2)(d) to the facts of this case. In making this choice, we are guided by three important points.

¶ 28. First, although only a limited number of decisions from other courts have relied upon the last clause of § 219(2)(d) in reaching a comparable decision, the language has been comprehensively and persuasively construed in recent decisions of the United States Supreme Court, *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). Both are sexual harassment cases brought under Title VII of the Civil Rights Act and in which the central issue was employer liability for acts of a supervisor of the plaintiff employee. Both sought to implement the earlier holding of the United States Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986), that "Congress's intent [was] that courts look to traditional principles of the law of agency in devising standards of employer liability in those instances where liability for the actions of a supervisory employee was not otherwise obvious." *Faragher*, 524 U.S. at 791-92. In looking at the traditional principles of the law of agency, the Court looked particularly at § 219(2)(d) of the Restatement and its last phrase.

¶ 29. In *Faragher*, the issue was whether an employer could be liable "for the acts of a supervisory employee whose sexual harassment of subordinates has created a hostile work environment amounting to employment discrimination." *Faragher*, 524 U.S. at 780. The Court concluded that liability could not be found under the rubric that the

supervisor was acting within the scope of his employment, *id.* at 798-801, and turned to the "aided in accomplishing the tort" language of § 219(2)(d). The Court rejected a narrow reading of the language:

> The City, however, contends that § 219(2)(d) has no application here. It argues that the second qualification of the subsection, referring to a servant "aided in accomplishing the tort by the existence of the agency relation," merely "refines" the one preceding it, which holds the employer vicariously liable for its servant's abuse of apparent authority.... But this narrow reading is untenable; it would render the second qualification of § 219(2)(d) almost entirely superfluous (and would seem to ask us to shut our eyes to the potential effects of supervisory authority, even when not explicitly invoked). The illustrations accompanying this subsection make clear that it covers not only cases involving the abuse of apparent authority, but also cases in which tortious conduct is made possible or facilitated by the existence of the actual agency relationship....
>
> We therefore agree with [plaintiff] that in implementing Title VII it makes sense to hold an employer vicariously liable for some tortious conduct of a supervisor made possible by abuse of his supervisory authority, and that the aided-by-agency-relation principle embodied in § 219(2)(d) of the Restatement provides an appropriate starting point for determining liability for the kind of harassment presented here.

*Id.* at 801-02. In describing further the application of § 219(2)(d), the Court noted that the supervisor-employee relationship provides access, and the power of the supervisor is such that the employee who is faced with harassment by the supervisor is not in a position to defend, as is normally true with a coworker. *Id.* at 803. Finally, the Court stated that recognition of liability for a supervisor's actions places the burden on the party that can guard against misconduct through screening, training and monitoring. *Id.*

¶ 30. *Ellerth* is a companion case, decided on the same day as *Faragher*, and addressing whether an employer has vicarious liability under Title VII when a supervisor creates a hostile work environment by threats to a subordinate of adverse employment actions, based on sex, but does not fulfill the threat. 524 U.S. at 754. Again, the Court turned to general agency principles and rejected the argument that

the supervisor was acting within the scope of his employment. Again, it looked to the last phrase of § 219(2)(d) of the Restatement. Recognizing that in the broadest sense the tort is aided by the supervisor-employee relationship, the Court rejected a reading that broad, holding that the employer's creation of the employment relationship alone is insufficient to meet the test of aiding in accomplishing the tort by the agency relationship as required by § 219(2)(d). 524 U.S. at 760. The Court held, however, that investing a supervisor with the power to take adverse employment action was sufficient to meet the section's test if the supervisor takes a tangible employment action against the employee as part of sexual harassment. *Id.* at 761 (liability in such circumstances "reflects a correct application of the aided in the agency relation standard"); *id.* at 762 ("Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates."); *id.* at 762-63 ("Whatever the exact contours of the aided in the agency relation standard, its requirements will always be met when a supervisor takes a tangible employment action against a subordinate."). In situations where the supervisor engages in sexual harassment conduct but takes no employment action, the Court found the application of the standard "less obvious" and discussed how the language could be interpreted either way. *Id.* at 763. Ultimately, the Court declined to "render a definitive explanation of our understanding of the standard" because other considerations controlled its interpretation of Title VII. *Id.*

¶ 31. We are, of course, not strictly bound by an interpretation of the Restatement of Agency by the United States Supreme Court, where we are not applying Title VII of the Civil Rights Act. We find, however, that *Faragher* and *Ellerth* are strong persuasive authority and are particularly helpful to our application of § 219(2)(d). Thus, we follow these decisions.[3]

---

[3] In following the United States Supreme Court decisions, we reject the dissent's claim that the Supreme Court "never intended for its decisions … to have any influence on the development of common-law agency principles or the application of § 219(2)(d) outside the specific context of Title VII." *Post*, at ¶ 68. The Supreme Court applied the Restatement of Agency because it found that "Congress wanted courts to look to agency principles for guidance" in deciding hostile environment sex discrimination cases under Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986). Thus, in *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998), the Court noted that it was relying on "the general common law of agency." (citation omitted). The Court noted that state court decisions could be "instructive," but they often relied upon federal decisions, *id.* at 755, and found the Restatement of Agency a useful starting point to find the general common law. *Id.* It went through the various sections of the Restatement (Second) of Agency and

¶ 32. Our second introductory point follows from the United States Supreme Court decisions. It is important not to adopt too narrow an interpretation of the last clause of § 219(2)(d), but it is equally important not to adopt too broad an interpretation. We are sensitive to the concern expressed by the trial court that plaintiff's arguments could lead to a rule that makes a principal liable for all intentional torts of an agent in all circumstances. Just as the Supreme Court decided that § 219(2)(d) could not be read to make employers liable for all acts of sexual harassment of supervisors against employees, we must similarly narrow any rule we decide upon.

¶ 33. Our third introductory point deals with the context of this case. The Court in *Faragher* was very careful to analyze the policy judgments behind § 219(2)(d) and apply it to implement those policies. We similarly examine some of those policy issues in the context of an intentional sexual tort of a law enforcement officer perpetrated on a community citizen the officer was charged to protect as part of his community policing function. The *Faragher* Court emphasized three main considerations in applying § 219(2)(d) in the supervisor-employee relationship: the opportunity for contact created by the relationship; the powerlessness of the employee to resist the supervisor and prevent the unwanted contact; and the opportunity to prevent and guard against the conduct. 524 U.S. at 803.

¶ 34. What makes the circumstances of this case virtually unique from a policy perspective is the extraordinary power that a law enforcement officer has over a citizen. A number of courts have talked about this power in finding vicarious liability in cases involving sexual assaults by police officers. See, e.g., *Applewhite v. City of Baton*

---

finally centered on § 219(2)(d) as the most useful. It then applied the "aided in the agency relation principle" of § 219(2)(d) to the situation before it. *Id.* at 760-65. The analysis in *Faragher v. City of Boca Raton*, 524 U.S. 775, 801-02 (1998), is similar, and as noted in the text, the Court resolved a dispute over the meaning of the language of § 219(2)(d), holding that the "aided-by-agency-relation principle" was not merely a refinement of apparent authority.

It is, of course, the nature of the common law that every appellate decision represents the development of the common law, and nothing in the Supreme Court decisions suggests they are not an integral part of that process. Indeed, the resolution of the dispute over the meaning of § 219(2)(d) in *Faragher* is exactly the kind of decision that best defines and develops the common law. No common-law court engaged in this process, and certainly not the highest court of this country, would expect that a common-law decision on one set of facts would have no influence on future decisions applying the same legal principle to a different factual scenario.

*Rouge*, 380 So. 2d 119, 121 (La. Ct. App. 1979), and *Mary M. v. City of Los Angeles*, 814 P.2d 1341, 1349-52 (Cal. 1991) (en banc).

¶ 35. *Mary M.* is explicitly policy-based and contains this rationale as part of the holding:

> At the outset, we observed that society has granted police officers extraordinary power and authority over its citizenry. An officer who detains an individual is acting as the official representative of the state, with all of its coercive power. As visible symbols of that power, an officer is given a distinctively marked car, a uniform, a badge, and a gun. As one court commented, "police officers [exercise] the most awesome and dangerous power that a democratic state possesses with respect to its residents — the power to use lawful force to arrest and detain them." *Policeman's Benev. Ass'n of N.J. v. Washington Tp.*, [850 F.2d 133, 141 (3d Cir. 1988).] Inherent in this formidable power is the potential for abuse. The cost resulting from misuse of that power should be borne by the community, because of the substantial benefits that the community derives from the lawful exercise of police power.

*Mary M.*, 814 P.2d at 1349. *Applewhite* has a similar rationale, although related to the traditional rationale of apparent authority:

> We particularly note that Officer Crowe was on duty in uniform and armed, and was operating a police unit at the time of this incident. He was able to separate the plaintiff from her companions because of the force and authority of the position which he held. He took her into police custody and then committed the sexual abuse upon her in the vehicle provided for his use by his employer.
>
> A police officer is a public servant given considerable public trust and authority. Our review of the jurisprudence indicates that, almost uniformly, where excesses are committed by such officers, their employers are held to be responsible for their actions even though those actions may be somewhat removed from their usual duties. This is unquestionably the case because of the position of such officers in our society.

*Applewhite*, 380 So. 2d at 121.

¶ 36. This power is especially pronounced when the tort is committed on a citizen the law enforcement officer is charged with protecting. The *Faragher* Court noted the particular power of an employment

supervisor who could inflict adverse employment actions on a resistant employee. Not only is the supervisor placed in the position to sexually harass the employee, but the fear of retaliation prevents the employee from resisting or complaining. See 524 U.S. at 803. In like manner, when the law enforcement officer is the wrongdoer, the citizen is also stripped of the official protection that society provides. The citizen is particularly vulnerable and defenseless.

¶ 37. The *Faragher* Court also emphasized the unique access to commit the tort the employment relationship can provide. In a very similar way, a law enforcement officer has unique access to a citizen who is depending upon the law enforcement officer for protection. We are struck by how modern law enforcement philosophies increase the significance of this factor. We live now in the era of community policing. As a result, the emphasis of police work is more on prevention and interaction with community members to create conditions that inhibit crime. See D. Stevens, *Community Policing and Police Leadership* in *Policing and Community Partnerships* 163, 165 (D. Stevens ed., Prentice Hall 2001) (community policing involves "a preventative response to public order through a level of delegation of authority with community members and line officers as a response to future crimes as opposed to a response after crimes have occurred"); W. Skogan & S. Hartnett, *Community Policing Chicago Style* 5-9 (Oxford Univ. Press 1997) (defines community policing and explains that police are "reorganizing to provide opportunities for citizens to come into contact with them under circumstances that encourage an information exchange, the development of mutual trust, and an opportunity for joint or coordinated activities"); S. Waldeck, *Cops, Community Policing, and the Social Norms Approach to Crime Control: Should One Make Us More Comfortable with the Others?*, 34 Ga. L. Rev. 1253, 1254 (2000) (defining community policing). This role requires community members to place confidence and trust in law enforcement officers as partners in preventing crime, as "Officer Friendly." Thus, the interaction between Forrest and plaintiff in this case occurred because Forrest was acting as plaintiff's protector and his visible presence would discourage those who might want to rob the convenience store.

¶ 38. Other courts have noted the effect of the unique access of a law enforcement officer on vicarious liability. For example, the Seventh Circuit Court of Appeals noted in a case where an officer sexually

molested a thirteen-year-old girl he routinely drove home so she would not be out after curfew:

> [W]hen the employee is a male police officer whose employer has invested him with intimidating authority to deal in private with troubled teenage girls, his taking advantage of the opportunity that authority and proximity and privacy give him to extract sexual favors from these girls should be sufficiently within the orbit of his employer-conferred powers to bring the doctrine of respondeat superior into play, even though he is not acting to further the employer's goals but instead is on a frolic of his own.

*West v. Waymire*, 114 F.3d 646, 649 (7th Cir. 1997) (internal citations omitted); see also *Red Elk v. United States*, 62 F.3d 1102, 1107 (8th Cir. 1995) (in case where officer picked up young woman for violating curfew, court held "it was also foreseeable that a male officer with authority to pick up a teenage girl out alone at night in violation of the curfew might be tempted to violate his trust. Claymore had that opportunity because of his employment, the trappings of his office, and the curfew policy he was to enforce.").

¶ 39. Finally, *Faragher* relied on the greater opportunity that employers had to "guard against misconduct by supervisors . . . ; employers have greater opportunity and incentive to screen them, train them, and monitor their performance." 524 U.S. at 803. As the California Supreme Court noted in *Mary M.*, 814 P.2d at 1347, imposing liability on the employer may prevent recurrence of tortious conduct by creating an incentive for vigilance by those in a position to prevent it.[4] No incentive to prevent this kind of conduct is created by leaving the victim uncompensated. Nor do we think we create an adequate incentive by requiring a plaintiff to prove that the employer inadequately supervised the officer. See *West v. Waymire*, 114 F.3d at 649 ("We want the police department to supervise its officers in this domain with especial care, and so we do not impose on the plaintiff the burden of establishing negligent supervision."). We also note the observation of the court in *Mary M.* that the costs of police misconduct should be borne by the community because the community derives

---

[4] The California Supreme Court also concluded "[t]here is little or no risk that preventive measures would significantly interfere with the ability of police departments to enforce the law and to protect society from criminal acts." *Mary M. v. City of Los Angeles*, 814 P.2d 1341, 1348 (Cal. 1991) (en banc).

substantial benefits from the lawful exercise of police power. 814 P.2d at 1349.

¶ 40. With these three points in mind, we turn to the alternative constructions of § 219(2)(d). We start with the superior court's construction under which it held that the last clause does not apply to the facts of this case. The superior court recognized that the language of the section appeared to fit, but concluded that a "plain reading" of the exception contained in the last clause would "eviscerate the general scope of employment rule" and looked for ways to narrow its application. It settled on the limitations adopted in *Gary v. Long*, 59 F.3d 1391, 1397-98 (D.C. Cir. 1995), a sexual harassment case brought under Title VII of the Civil Rights Act. *Gary* adopted two limitations on the broad coverage of the exception. First, drawing on examples in the official comment to § 219(2)(d) as described in the concurring opinion in *Barnes v. Costle*, 561 F.2d 983, 996 (D.C. Cir. 1977) (MacKinnon, J., concurring), the court held that the exception makes the employer liable only if the tort was " 'accomplished by an instrumentality, or through conduct associated with the agency status.' " *Gary*, 59 F.3d at 1397. Second, it adopted a limitation from the comment to § 261, a section cited in the comment to § 219(2)(d). *Gary*, 59 F.3d at 1398. The comment stated:

> Liability is based upon the fact that the agent's position facilitates the consumption of the [tort], in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.

Restatement (Second) of Agency § 261, cmt. a. The court added from a comment to § 166:

> If a person has information which would lead a reasonable man to believe that the agent is violating the orders of the principal or that the principal would not wish the agent to act under the circumstances known to the agent, he cannot subject the principal to liability.

*Id.* § 166, cmt. a. The superior court applied this second limitation in part to find that the exception in the last clause of § 219(2)(d) did not apply.

¶ 41. We conclude that the holding in *Gary* did not survive the Supreme Court decisions in *Faragher* and *Ellerth*. We read *Faragher* as

rejecting the second limitation imposed by *Gary*, that the transaction seems "regular" to a third party and the agent appears to be acting within the authority given by the principal. This limitation is clearly a refinement of apparent authority analysis. See *Faragher*, 524 U.S. at 802 (§ 219(2)(d) "covers not only cases involving the abuse of apparent authority, but also cases in which tortious conduct is made possible or facilitated by the existence of the actual agency relationship"); see also *Costos v. Coconut Island Corp.*, 137 F.3d 46, 49 (1st Cir. 1998) (argument that the last clause of § 219(2)(d) is a branch of apparent authority is inconsistent with the plain meaning of the words, and renders it superfluous). Since we have embraced the analysis in *Faragher* and *Ellerth*, we reject the holding of *Gary* and particularly its second limitation, as relied upon by the superior court.[5]

¶ 42. An alternative method of narrowing § 219(2)(d), such that plaintiff would not prevail, is presented by the recent decision of the Maine Supreme Judicial Court in *Mahar v. StoneWood Transp.*, 2003 ME 63, 823 A.2d 540. In *Mahar*, the Maine court apparently held that § 219(2)(d) applies only in cases of misrepresentation or deceit. *Id.* at ¶ 21. In reaching this conclusion the court first relied upon the comment to § 219(2)(d) which provides:

> Clause (d) includes primarily situations in which the principal's liability is based upon conduct which is within the apparent authority of a servant, as where one purports to speak for his employer in defaming another or interfering with another's business. See §§ 247-249. Apparent authority may also be the basis of an action of deceit (§§ 257-264), and even physical harm. See §§ 265-267. In other situations, the servant may be able to cause harm *because of his position* as agent, as where a telegraph operator sends false messages purporting to come from third persons. See § 261. Again, the manager of a store operated by him for an undisclosed principal is enabled to cheat the customers because of his position. See § 222. The enumeration of such situations is not exhaustive, and is intended only to indicate the area within which a master may be subjected to liability for acts of his servants not in scope of employment.

---

[5] We do not war with the first limitation of *Gary v. Long*, 59 F.3d 1391 (D.C. Cir. 1995), which was drawn from the *Barnes v. Costle*, 561 F.2d 983 (D.C. Cir. 1977) (MacKinnon, J., concurring), concurrence and is consistent with the language of the Restatement section. Plaintiff's theory is consistent with that limitation.

Restatement (Second) of Agency § 219(2)(d), cmt. e (emphasis added). The court found in the comment a limit on the section's applicability to "cases within the apparent authority of the employee, or when the employee's conduct involves misrepresentation or deceit." *Mahar*, 2003 ME 63, at ¶ 21. Based on a law review article discussing the deliberations in the American Law Institute over § 219(2)(d), see Casenote, *Costos v. Coconut Island Corp.: Creating a Vicarious Liability Catchall Under the Aided-by-Agency-Relation Theory*, 73 U. Colo. L. Rev. 1099, 1105 (2002), the court concluded that the section was intended to apply in "cases involving apparent authority, reliance, or deceit." *Mahar*, 2003 ME 63, at ¶ 21.

¶ 43. The facts of *Mahar* involved only a weak claim that § 219(2)(d) provided vicarious liability. The defendant was a trucking company that employed a driver who assaulted plaintiff automobile driver in a road rage incident in which the truck driver thought that plaintiff was driving behind him with his high beams on. The court found that the truck driver engaged in no misrepresentation or deceit, and therefore § 219(2)(d) did not apply. *Id.* at ¶ 24.

¶ 44. Although we do not disagree with the holding of *Mahar* on the facts before the court, we are not persuaded by its rationale. The plain language of the section is directly against importing into it a requirement of misrepresentation or deceit. Although one of the hypotheticals in the comment involves misrepresentation or deceit, the other does not, and the comment does not limit the reach of the section language in this respect. Indeed, the comment specifically states that the "enumeration of such situations is not exhaustive." Restatement (Second) of Agency § 219(2), cmt. e. Finally, the most important use of the last clause of § 219(2)(d) has been in sexual harassment law, and this application often does not involve deceit or misrepresentation. Thus, the *Mahar* construction of § 219(2)(d) is also inconsistent with *Faragher* and *Ellerth*.

¶ 45. More important, we doubt that the *Mahar* decision would determine the result in this case. As our analysis of the policy considerations shows, this is a vastly different case from *Mahar*. The difference is shown by the Maine court's analysis of *Costos* in which the Court of Appeals applied § 219(2)(d) as part of Maine law to hold that the owner of an inn was vicariously liable when the inn manager entered the room of plaintiff guest using a master key and raped her. The holding of the *Costos* court is contained in the following paragraph:

Even viewing this case through the narrower focus of the commentary on Restatement § 219, which the *Gary* court found helpful, defendants are well within the scope of § 219(2)(d) liability. By virtue of his agency relationship with the defendants, as manager of the inn, [the manager] was entrusted with the keys to the rooms, including Costos' room, at the Bernard House. Because he was the manager of the inn, [he] knew exactly where to find Costos. The jury could find that [the manager] had responsibilities to be at the inn or to have others there late at night. In short, because he was the defendants' agent, [the manager] knew that Costos was staying at the Bernard House, he was able to find Costos' room late at night, he had the key to the room and used the key to unlock the door, slip into bed beside her as she slept, and rape her.

137 F.3d at 50. In *Mahar*, the Maine court distinguished, but did not reject, *Costos* because the inn manager in that case "acted deceitfully by using his position as an employee to learn the room number of the female guest, and by misusing a duplicate key to enter her room." *Mahar*, 2003 ME 63, at ¶ 23. The lesson from *Mahar* appears to be that the *Costos* analysis correctly interprets § 219(2)(d), if, in addition, plaintiff shows misrepresentation or deceit. In the same way that the *Mahar* court found deceit in *Costos*, we are convinced that it would find deceit in this case.

¶ 46. As our discussion suggests, we are more comfortable with the analysis in *Costos* than that in *Mahar*, and the *Costos* analysis is the only other construction of § 219(2)(d) that we have not considered above. *Costos* is consistent with the view of a number of commentators that employers should be vicariously liable for torts committed by employees involving an abuse of job-created authority, particularly where the tort involves sexual abuse. See L. Jorgenson et al., *Transference of Liability: Employer Liability for Sexual Misconduct by Therapists*, 60 Brook. L. Rev. 1421, 1435-39 (1995); Note, *A Matter of Trust: Imposing Employer Vicarious Liability for the Intentional Torts of Employees*, 3 D.C. L. Rev. 167, 183-85 (1995); Note, *"Scope of Employment" Redefined: Holding Employers Vicariously Liable for Sexual Assaults Committed by Their Employees*, 76 Minn. L. Rev. 1513, 1527-30 (1992). Each of the articles analyzes cases where courts have found vicarious liability under traditional principles, but the analysis is debatable and better viewed explicitly as situations where the nature and powers of the job created by the employer should give

rise to vicarious liability even for certain intentional torts outside the scope of the employment.

¶ 47. Nevertheless, we do not adopt the full rationale of *Costos* in this decision. Our primary reason is our second introductory point above, that we find it best to adopt a rationale as narrow as possible under the circumstances. We are guided by the Supreme Court's decision in *Ellerth* not to venture beyond what is necessary to decide the case. See 524 U.S. at 763 ("The aided in the agency relation standard, however, is a developing feature of agency law, and we hesitate to render a definitive explanation of our understanding of the standard in an area where other important considerations must affect our judgment."). We also note that the California Supreme Court, which found vicarious liability for police misconduct in *Mary M.* based on a rationale that is a variation of abuse of job-created authority, refused to apply its reasoning to other professions. See *John R. v. Oakland Unified Sch. Dist.*, 769 P.2d 948, 956-57 (Cal. 1989) (teacher sexual assault on a ninth-grade student).[6]

---

[6] The dissent creates a cross-fire of criticism, arguing first that the decision is so broad as to create "a threat of vicarious liability that knows no borders," *post*, at ¶ 59, and then that it is too narrow because it "fails to set forth any basis to distinguish a police officer's 'power' from that of other employees in analogous positions of authority over vulnerable populations" and represents "it is because we say so" jurisprudence. *Post*, at ¶ 77. The criticism does not prompt us to decide cases not before us. We do cite the California cases to point out that principled distinctions can be drawn between law enforcement officers and others in positions of authority. Whether we should adopt those distinctions should be left to future decisions.

On this point, the dissent places significance on the fact that "several justices of the California Supreme Court have concluded that *Mary M.* was wrongly decided and should be overruled." *Post*, at ¶ 72. This criticism is misleading to the extent that it implies that the justices who authored *Mary M.* have changed their position or that *Mary M.* has been overruled. On the vicarious liability holding, *Mary M.* was a 5-to-2 decision, with Justices Baxter and Lucas writing a long and detailed concurrence where they dissented on this point. See 814 P.2d at 1357-68. In December of 1995, roughly four years after issuing *Mary M.*, the court revisited the vicarious liability principles in *Farmers Ins. Group v. County of Santa Clara*, 906 P.2d 440 (Cal. 1995), and *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 907 P.2d 358 (Cal. 1995), the cases cited in the dissent. In each of these cases, the plaintiff argued that the principles of *Mary M.* should be extended to cover the facts of the situation before the court: in *Farmers Insurance Group* to the sexual harassment of a deputy sheriff by another deputy sheriff and in *Lisa M.* to sexual fondling of a hospital patient by an ultrasound technician during an examination. In both, a majority of the court found *Mary M.* distinguishable.

Justices Baxter and Lucas reiterated their disagreement with *Mary M.*, arguing that it should be overruled for the reasons they stated previously. They were joined by one

¶ 48. As our third opening point demonstrates, application of § 219(2)(d) to a sexual assault on a citizen by a law enforcement officer is probably the strongest application of the core principles behind § 219(2)(d) as explained in *Faragher*. See L. Jorgenson et al., *supra*, at 1435-36 (employer liability based on job-created authority is found most commonly in cases involving law enforcement officers). Thus, based on the *Faragher* analysis, we hold that if plaintiff can show that an on-duty law enforcement officer was aided in accomplishing an intentional tort involving a sexual assault on the plaintiff by the existence of the employment relationship with the law enforcement agency, vicarious liability will apply.

¶ 49. In reaching this decision, we reject the argument of the dissent that any policy that allows vicarious liability for intentional torts of law enforcement officers must be made by the Legislature. This is a case of first impression in which we are discharging our traditional role of defining the common law. Exactly because we seek to follow the common law as it has developed in the jurisdictions in this country, we have used the Restatement of Agency to find the appropriate law. See American Law Institute, I Restatement of the Law of Contracts, introduction at viii (1932) (explaining that the purpose of a Restatement is "the preparation of an orderly restatement of the common law" to reduce uncertainty in the law). In saying this, we do not shirk from our duty "to adapt the common law to the changing needs and conditions of the people of this state." *Hay v. Med. Ctr. Hosp. of Vt.*, 145 Vt. 533, 542, 496 A.2d 939, 944 (1985). This is not a case like *Hillerby v. Town of Colchester*, 167 Vt. 270, 272-73, 706 A.2d 446, 447 (1997), where our action would reverse a long-standing common law principle which the Legislature has endorsed and on which it has

new justice, Justice George, who replaced one of the *Mary M.* majority justices. Contrary to the dissent in this case, I draw no significance from the fact that those who disagreed with *Mary M.* continue to adhere to their position or that they are joined by an additional justice who did not sit on *Mary M.* I do find it significant, however, that *Mary M.* remains the law of California. Although the California Supreme Court has not revisited the decision since 1995, it is being applied, and distinguished where appropriate, in decisions of the California Court of Appeals. See, e.g., *Maria D. v. Westec Residential Security, Inc.*, 102 Cal. Rptr. 2d 326, 326-27 (Ct. App. 2000) (*Mary M.* does not apply to rape by a private security guard); *Thorn v. City of Glendale*, 35 Cal. Rptr. 2d 1 (Ct. App. 1994) (*Mary M.* does not apply to suit against the city for action of fire marshal in setting fire to a building the marshal was inspecting). The analysis in these cases, as well as in *Farmers Insurance Group, Lisa M.*, and *John R. v. Oakland Unified School District*, is a strong response to the dissent's argument that the circumstances in this case cannot be rationally distinguished from others where the intentional tort is committed by a person with a position of authority over a vulnerable person.

relied. Indeed, we have narrowly tailored our holding so that we are confident that few future cases will be controlled by it. If the Legislature disagrees with our balancing of the various considerations behind this decision, it can and should enact a different vicarious liability rule.

¶ 50. We turn now to the application of § 219(2)(d), as we have interpreted it, to the facts of this case. As we set out above, the superior court granted summary judgment to defendants because it found that plaintiff had not made a specific showing to bring herself within the language of the section; specifically, the court found: (1) even if Forrest was able to gain information about plaintiff while on duty, it was not "pursuant to an official investigation"; (2) his position did not aid him in gaining information about plaintiff because anyone was free to enter the store and ask questions; (3) Forrest never used his gun, handcuffs or other instrumentalities in accomplishing the crime; (4) even if Forrest had used the instrumentalities in committing the crime, a reasonable person would know that such use is not authorized; and (5) there is no evidence that the presence of his police car in front of the car warded off other patrons. As is apparent from our rejection of the limiting construction of § 219(2)(d) adopted by the superior court, we do not find the fourth reason relevant. We disagree that we can rely on the other reasons to deny summary judgment, generally because they are based on inferences that have not been viewed most favorably to the plaintiff as required by our summary judgment standard. See *King*, 2003 VT 34, at ¶ 7.

¶ 51. The issue of how Forrest gained access to plaintiff all alone in the store is disputed. One witness described that Forrest had been asking questions about plaintiff's work schedule. He entered the store when another employee was also working and bought food and left. He reentered about fifteen to thirty minutes after the second employee went off duty and loitered until all customers left. He parked his cruiser in front of the store with the parking lights on. When plaintiff's mother called plaintiff, Forrest took the telephone, terminated the conversation and hung it up.

¶ 52. The evidence went to Forrest's special access to plaintiff created by his job and enabling him to commit the tort. The trial court concluded that the information about plaintiff's schedule was not gathered in an investigation and could have been obtained by anyone on inquiry, and that there was no evidence that Forrest deterred anyone from entering the store. We believe that a jury could conclude that others could not ask the kind of questions and gain the kind of

access Forrest did without his special status as a law enforcement officer. Moreover, the jurors could conclude based on their own experience that the presence of the cruiser with its parking lights on would deter persons from entering the store. We do not believe that the court could find as a matter of law that Forrest did not have special access to plaintiff: access created by the existence of the agency relationship that aided the commission of the tort.

¶ 53. With respect to Forrest's weapons, other instruments, and ability to inflict injury, the superior court relied upon the fact that Forrest never used his gun or other instruments on plaintiff. We do not believe the absence of evidence of actual use was determinative.

¶ 54. The evidence bearing on the issue came, almost entirely, from plaintiff's deposition; her testimony has aspects that support both her case and that of defendant. She testified that Forrest told her on the day of the sexual assault that if he ever used his gun he would shoot to kill. When asked whether she complained when Forrest grabbed her ponytail and used it to pull her head from side to side, she answered:

> A. I kind of just went along with it hoping that he would just leave and go back to work. And I was hoping somebody would come in the store. I really — um, he was — had a controlling power over me. I mean he had a gun. He had handcuffs. I didn't — I didn't — I don't —

She went on to acknowledge that Forrest never threatened to use his gun or handcuffs. When asked why she didn't use the telephone to call for help, she answered first that she "kept thinking about her cousin," who was killed in a domestic violence incident and then that she was "too scared" and "who knows what would have happened. Once again, this man had a gun." When asked what made her fear that Forrest would use the gun, she answered that it was the comment that if he ever used the gun, it would be to shoot to kill. After plaintiff described the sexual assault, she answered questions about her thoughts and motives as follows:

> Q. Is there any other reason why you were intimidated by Richard Forrest?
>
> A. Just his, his power. I mean he was a police officer.
>
> Q. Well, you didn't have any problem calling the police about a police officer who allegedly raped you, right?
>
> A. Right.

Q. I mean was there some reason why you felt that you couldn't do something to help yourself because he was a police officer?

A. I don't know.

Q. Did it even enter into your mind?

A. I guess not.

Q. Right. He was just a big guy who was physically forcing you to do something you didn't want, right?

ATTORNEY MYERSON: Objection.

ATTORNEY LYNN: Q. Right?

A. I, I don't know.

Q. Well, you just don't remember?

A. I do remember. I just — I don't know if it was because of his uniform or I — I don't know.

Q. It may have been; it may not have been?

A. Yes.

Q. At this point, you just don't remember?

A. I — I do remember. I just — I don't — I don't know.

¶ 55. Defendants rely primarily on the last statements above as showing that the fact that Forrest was a police officer had nothing to do with plaintiff's submission to the sexual assault. Plaintiff relies upon her earlier statements that she went along because Forrest had controlling power over her because of the handcuffs and the gun.

¶ 56. We have cautioned about granting summary judgment "in any cases in which the resolution of the dispositive issue requires determination of state of mind, as the fact finder normally should be given the opportunity to make a determination of the credibility of witnesses, and the demeanor of the witness whose state of mind is at issue." *Barbagallo v. Gregory*, 150 Vt. 653, 653, 553 A.2d 151, 151 (1988) (mem.). Here, the extent to which Forrest's position as a law enforcement officer, with the gun and handcuffs, enabled him to force or persuade plaintiff to perform fellatio on him without significant

physical resistance or cries for help is disputed. The issue goes to plaintiff's state of mind, and we do not believe that her state of mind can be determined as a matter of law from the summary judgment record. A jury could find based on this evidence that despite the fact that Forrest never used or threatened to use his gun on plaintiff, his position and implements sufficiently intimidated and scared plaintiff to enable him to commit the tort.

¶ 57. In summary, we find that none of the reasons advanced by the trial court warrant summary judgment for defendants on the § 219(2)(d) claim.

## IV. *Conclusion*

¶ 58. Although we conclude that the superior court correctly held that defendants were entitled to summary judgment on the claim under 24 V.S.A. § 309 and on the theories of vicarious liability we have examined in the past, we also conclude that a fact-finder could find defendants vicariously liable under § 219(2)(d) of the Restatement (Second) of Agency, a theory of liability we expressly adopt. Specifically, the fact-finder can find that Forrest was "aided in accomplishing the tort by the existence of the agency relation," as we have defined that language in this decision.

*Reversed and remanded.*

¶ 59. **Skoglund, J.,** dissenting. I do not quarrel with the Court's adoption of § 219(2)(d) of the Restatement (Second) of Agency as an exception to our scope-of-employment rule for purposes of determining vicarious liability. I submit, however, that in its broad application of the last clause of that section to the facts of this case, specifically a sexual assault committed by a law enforcement officer while acting outside the scope of employment, the majority has created a threat of vicarious liability that knows no borders. While the majority limits its holding to sexual assaults committed by "on-duty law enforcement officers," *ante,* at ¶ 48, the standard that it articulates applies to a broad range of employees whose duties grant them unique access to and authority over others, such as teachers, physicians, nurses, therapists, probation officers, and correctional officers, to name but a few. As the trial court here aptly observed, the Court's interpretation could virtually "eviscerate[] the general scope of employment rule." Whether today's holding stands as a legal aberration, a special departure from the general principles of respondeat superior created exclusively for law enforcement agencies, or the first in a new line of

cases imposing vicarious liability on public and private employers for the sexual misconduct of their employees, only time will tell. In either case, irreparable and unwarranted damage will have been done, not only to the law enforcement agencies unfairly singled out for disparate treatment by today's decision, but to every public and private employer compelled to defend itself against the inevitable spate of lawsuits seeking to extend today's ruling. Therefore, I respectfully dissent.

¶ 60. Like the finding of a duty of care in negligence law, the imposition of vicarious liability under agency principles flows not from the rote application of rules, but from a considered policy judgment that it is fair and reasonable to hold an employer liable for the harmful actions of its employee. As Justice Souter, writing for the United States Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), cogently observed: "In the instances in which there is a genuine question about the employer's responsibility for harmful conduct he did not in fact authorize, a holding that the conduct falls within the scope of employment ultimately expresses a conclusion not of fact but of law. . . . [T]he 'highly indefinite phrase' [vicarious liability] is 'devoid of meaning in itself' and is 'obviously no more than a bare formula to cover the unordered and unauthorized acts of the servant for which it is found to be expedient to charge the master with liability, as well as to exclude other acts for which it is not.'" *Id.* at 796 (quoting W. Keaton et al., Prosser and Keaton on Law of Torts § 502 (5th ed. 1984); see also *Yamaguchi v. Harnsmut*, 130 Cal. Rptr. 2d 706, 713 (Ct. App. 2003) ("[Vicarious] liability is based not on the employer's fault, but on public policies concerning who should bear the risk of harm created by the employer's enterprise.").

¶ 61. In its lengthy opinion, the majority here devotes considerable attention to the doctrinal debate over the meaning of an opaque phrase in a nonbinding provision of the restatement of the law of agency, yet barely addresses the broad policy ramifications of its decision holding a county sheriff's department vicariously liable for a sexual assault committed by a deputy sheriff acting entirely outside the normal scope of his employment duties. With respect, I submit that the majority's analysis is inadequate to support so extraordinary a holding, and that such a significant expansion of public entity liability should be left to the branch best equipped to consider all of the underlying social and economic ramifications, the Legislature.

¶ 62. "Under the settled doctrine of respondeat superior, an employer or master is held vicariously liable for the tortious acts of an employee or servant committed during, or incidental to, the scope of employment." *Brueckner v. Norwich Univ.*, 169 Vt. 118, 122-23, 730 A.2d 1086, 1090 (1999). We have recognized that there are circumstances where even the intentional, unauthorized torts of an employee may be seen as "intending to advance the employer's interests" and therefore fairly considered within the scope of employment. *Sweet v. Roy*, 173 Vt. 418, 431-32, 801 A.2d 694, 704 (2002). Outside the context of sexual harassment in the workplace, however — a special case more fully discussed below — this Court has never held that an employer may be vicariously liable for a sexual assault committed by an employee.[7]

¶ 63. Indeed, consistent with Vermont precedent, the majority accurately characterizes Deputy Forrest's crime as "rooted in prurient self-interest" — rather than as intended to advance the interests of his employer — and therefore outside the proper scope of his employment. *Ante*, at ¶ 18. Nevertheless, relying on an ambiguous rule cited by the United States Supreme Court in two workplace discrimination decisions, *Faragher*, 524 U.S. at 801, and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998), the majority concludes that Deputy Forrest's employer — the Bennington County Sheriff's Department — may be held vicariously liable to the victim of his crime. The majority's path to this startling conclusion is worth exploring.

¶ 64. The rule in question is set forth in § 219(2)(d) of the Restatement (Second) of Agency, which provides that a master is not subject to liability for the torts of a servant acting outside the scope of employment unless "the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation." Restatement (Second) of Agency § 219(2)(d) (1958). While acknowledging — as indeed it must — that there was no evidence the Department had conferred upon Deputy Forrest the "apparent authority" to engage in sexual assault, the majority nevertheless concludes that there was sufficient disputed evidence that he was

---

[7] Derivative or vicarious liability of an employer for the intentional misconduct of an employee is to be distinguished, of course, from an employer's direct liability for the negligent hiring or supervision of an employee. *Brueckner v. Norwich Univ.*, 169 Vt. 118, 126, 730 A.2d 1086, 1093 (1999). There was no allegation or evidence here, however, that the assault was the result of the Sheriff's Department's failure to adequately screen, train, or supervise Deputy Forrest.

"aided in accomplishing the tort by the agency relation" to survive summary judgment. In support of this conclusion, the majority relies on *Faragher* and *Ellerth*, companion cases in which the United States Supreme Court addressed the circumstances in which an employer may held liable, under Title VII of the Civil Rights Act of 1964, for sexual harassment perpetrated by a supervisor against an employee. Observing that numerous lower court decisions had drawn upon a variety of agency law principles enumerated in the Restatement (Second) of Agency to reach conflicting holdings, Justice Souter, writing for the Court in *Faragher*, cautioned that "[t]he proper analysis ... calls not for a mechanical application of indefinite and malleable factors set forth in the Restatement, see, *e. g.,* §§ 219, 228, 229, but rather an inquiry into the *reasons* that would support a conclusion that harassing behavior *ought* to be held within the scope of a supervisor's employment, and the reasons for the opposite view." 524 U.S. at 797 (emphasis added).

¶ 65. The Court concluded that the Congressional policies underlying Title VII — to prevent harassment in the workplace and encourage employers to adopt anti-harassment policies and establish reliable and accessible internal grievance mechanisms — would be well served by holding an employer vicariously liable when the misuse of supervisory authority, even if technically outside the scope of employment, creates a pervasively hostile work environment sufficient to alter the terms or conditions of a victim's employment or results in a tangible negative employment decision.[8] In so holding, the Court found "that the aided-by-agency-relation principle embodied in § 219(2)(d) of the Restatement provides an appropriate starting point for determining liability for the kind of harassment presented here." *Faragher*, 524 U.S. at 802. The Court was careful to explain, however, that in relying on

---

[8] In distinguishing the two types of discrimination, the Court explained that where the supervisory misconduct results in a tangible employment action, such as firing, failing to promote, or reassignment, it "requires an official act of the enterprise, a company act," and thus "becomes for Title VII purposes the act of the employer." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998). For sexual harassment not involving a tangible employment decision, the Court found that imposing vicarious liability upon the employer would provide incentives to promote the policies of Title VII, but also recognized that the employer should be able to assert as an affirmative defense that it "had exercised reasonable care to avoid harassment and to eliminate it when it might occur, and that the complaining employee had failed to act with like reasonable care to take advantage of the employer's safeguards ...." *Faragher v. City of Boca Raton*, 524 U.S. 775, 805 (1998).

§ 219(2)(d) its intention was not "to make a pronouncement of agency law in general," but rather "to adapt agency concepts to the practical objectives of Title VII." *Id.* at 802 n.3.[9]

¶ 66. Since the *Faragher* and *Ellerth* decisions, courts and commentators have disputed the proper scope of the "aided-in-accomplishing" clause of § 219(2)(d) outside the Title VII context. Some have severely criticized the Court for distorting the principles of vicarious liability embodied in § 219(2)(d), arguing that the Court fundamentally misinterpreted the second clause as completely independent of the first, and that properly understood it applies only where the agent "purported to act or speak on behalf of the principal and he was aided in accomplishing the tort by the existence of the agency relationship." P. Dalley, *All in a Day's Work: Employers' Vicarious Liability for Sexual Harassment*, 104 W. Va. L. Rev. 517, 550 (2002). According to the critics, the result of that misunderstanding, if applied elsewhere, would be to "vastly expand vicarious tort liability, and would make the scope of employment requirement largely superfluous." *Id.* Others, relying on the history of § 219(2)(d) and the debates among the drafters at the 1956 Proceedings of the American Law Institute, have argued that the aided-in-accomplishing clause "does not properly apply in intentional physical tort cases that lack elements of reliance or deceit." Casenote, *Costos v. Coconut Island Corp.: Creating a Vicarious Liability Catchall under the Aided-by-Agency-Relation Theory*, 73 U. Colo. L. Rev. 1099, 1130 (2002); accord *Mahar v. StoneWood Transp.*, 2003 ME 63, ¶ 21, 823 A.2d 540 ("section 219(2)(d) ... is limited in its application to cases within the apparent authority of the employee, or when the employee's conduct involves misrepresentation or deceit"). An example of such reasoning can be found in *Costos v. Coconut Island Corp.*, 137 F.3d 46, 49-50 (1st Cir. 1998), where the court held that a hotel may be vicariously liable for the rape of a hotel guest by the hotel manager because the manager had been entrusted with the room keys, knew in what room the victim was located, and had access to the hotel at night, and therefore was "aided in accomplishing the tort" by the agency relationship.

---

[9] Even before the Supreme Court's decisions in *Faragher* and *Ellerth*, this Court in *Allen v. Dep't of Employment & Training*, 159 Vt. 286, 618 A.2d 1317 (1992), reached a similar conclusion concerning an employer's potential liability for sexual harassment in the workplace. See *id.* at 291, 618 A.2d at 1320 (relying on Title VII cases and § 219(2)(d) to suggest that knowledge of supervisor's sexual harassment of employee could in some circumstances be imputed to employer).

¶ 67. Weighing in on this doctrinal debate, the majority here rejects the arguments for a narrow construction of the second clause of § 219(2)(d) in favor of a broader reading that would impose vicarious liability on a law enforcement agency whenever the "plaintiff can show that an on-duty law enforcement officer was aided in accomplishing an intentional tort involving a sexual assault on the plaintiff by the existence of the employment relationship with the law enforcement agency." *Ante*, at ¶ 48. Such a reading is consistent, the majority argues, with *Ellerth* and *Faragher*, where the employers purportedly created the special conditions of "access" and "power" that enabled their employees to engage in sexual misconduct. *Ante*, at ¶¶ 29, 30.

¶ 68. With respect, I submit that the majority's analysis and conclusion are fundamentally flawed. First, as noted, the high court never intended for its decisions in *Faragher* and *Ellerth* to have any influence on the development of common-law agency principles or the application of § 219(2)(d) outside the specific context of Title VII. Second, the drafters' intentions with respect to § 219(2)(d), whether expansive or narrow, are largely beside the point when it comes to deciding whether to hold a law enforcement agency vicariously liable for a sexual assault perpetrated by one of its officers. That issue — as noted — turns on policy considerations of a broad nature, considerations that the majority barely acknowledges and insufficiently analyzes.

¶ 69. The "policy" most pertinent to the issue, according to the majority, is the "extraordinary power that a law enforcement officer has over a citizen." *Ante*, at ¶ 34. Others mentioned are the "unique access" that a police officer's position affords for the commission of sexual assaults, particularly in the current "era of community policing," *ante*, at ¶¶ 37, 38; the "vulnerab[ility]" of the victim whose safety the officer is charged to protect, *ante*, at ¶ 36; the assumption that "imposing liability on the employer may prevent [the] recurrence of tortious conduct by creating an incentive for vigilance by those in a position to prevent it"; *ante*, at ¶ 39; and finally the idea that "the costs of police misconduct should be borne by the community because the community derives substantial benefits from the lawful exercise of police power." *Id.*

¶ 70. None of these asserted policy considerations withstands scrutiny. While it is certainly enlightening to learn that we live in a new "era of community policing" (like many so-called reforms, the concept of "community policing," viewed in historical context, looks very much

like the old-fashioned policeman "on the beat" that existed for many years), the majority fails to explain how "community policing" forms the policy basis for holding the Sheriff's Department vicariously liable for the sexual assault committed by Deputy Forrest. The majority notes that Deputy Forrest's ostensible justification for being in the store may have been related to his police function, and that the assault may therefore have been facilitated by his employment and aided by his "power" relationship with the victim. But this does not answer the question of why it is fair to hold a law enforcement agency liable for an officer's outrageous abuse of that power. When there has been no showing that the police department itself was negligent in hiring, training, or supervising its officer, why is it fair or reasonable to burden the public with liability for a sexual assault perpetrated by a rogue employee solely for his own twisted personal gratification?

¶ 71. It is certainly true that police officers occupy a position of trust and authority by virtue of their employment, and that this authority informed the decision on which the majority principally relies, *Mary M. v. City of Los Angeles*, 814 P.2d 1341, 1349 (Cal. 1991). What the majority does not explain, however, is how — if at all — this distinguishes police officers from many other employees, both public and private, who occupy parallel positions of authority. An employee's "access" or opportunity to commit an intentional tort may be facilitated by a "trust" relationship in many different contexts (e.g., the postal service employee or UPS deliverer admitted to a home by virtue of the trust engendered by the position, the tow-truck operator called to help an unsuspecting motorist stranded on the highway, the psychiatrist entrusted with a child in the privacy of his or her office), and the range of employees vested with some form of "power" — in many cases extraordinary power — over others by virtue of their employment is considerable. Apart from labeling the police officer's authority as "unique," the majority fails to explain what qualitatively distinguishes a law enforcement officer's power over a "vulnerable" detainee from a correctional officer's power over a prisoner, a teacher's power over a student, a psychiatric nurse's power over a mentally ill patient, a residential counselor's power over the teen-age residents of a group home, or a probation officer's power over a probationer, to name only a few analogous relationships.

¶ 72. Indeed, building on the holding in *Mary M.*, some courts have advocated for the extension of vicarious liability to other professions based precisely on such unexamined considerations. See, e.g., *Harrington v. Louisiana State Bd. of Elementary & Secondary Educ.*, 714

So. 2d 845, 851-52 (La. Ct. App.) (rape of student by community college instructor may be imputed to state employer based on "authority given to [the instructor]"), *cert. denied*, 728 So. 2d 1287, 1288 (La. 1998). Other courts, however, have rejected the facile argument for vicarious liability based simply on the employee's authority. In *Niece v. Elmview Group Home*, 929 P.2d 420, 430 (Wash. 1997), for example, the court declined to hold a residential facility vicariously liable for an employee's rape of a resident absent "sound policy reason[s] to shift the loss created by the employee's intentional wrong from one innocent party to another." Even more significantly, several justices of the California Supreme Court have concluded that *Mary M.* was wrongly decided and should be overruled. See *Farmers Ins. Group v. County of Santa Clara*, 906 P.2d 440, 459 (Cal. 1995) (Baxter, J., concurring) (writing separately to express his "disagreement with *Mary M.*"); *id.* at 460-61 (George, J., joined by Lucas, C.J., concurring) (characterizing *Mary M.* as "an aberration that should be overruled"); see also *Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 907 P.2d 358, 367 (Cal. 1995) (George, J., joined by Lucas, C.J., concurring) (calling for *Mary M.* to be overruled). While concurring in the court's unwillingness to extend the *Mary M.* rule to other professions, these justices have candidly acknowledged the absence of any principled distinction between the scope of authority exercised by police officers and that of other professions such as teachers, and have called for the end to the "special rules, purportedly applicable only to on-duty police officers." *Farmers Ins.*, 906 P.2d at 461 (George, J. & Lucas, C.J., concurring) ("Police officers should be governed by the *same* standard employed in determining whether the misconduct of *other* employees falls within the scope of employment. Police officers occupy a position of trust and authority in our society, but the same is true of other public employees, such as teachers.").

¶ 73. The majority also suggests that the imposition of vicarious liability for intentional sexual misconduct by police officers serves the public good by providing an "incentive" for better training and supervision. The injury-prevention rationale might work in the context of workplace sexual harassment, but I fail to understand how better *training* will deter an intentional sexual assault committed solely out of personal motivations. Indeed, the majority does not cite a single example or empirical authority suggesting what the Sheriff's Department might do differently to prevent future assaults. See Note, *Mary M. v. City of Los Angeles: Should a City Be Held Liable Under*

*Respondeat Superior for a Rape by a Police Officer?*, 28 U.S.F. L. Rev. 419, 450-53 (1994) (noting that employers' practical ability to prevent sexual assaults of this nature is "slight"). Nor does the majority even mention the greater likelihood that vicarious liability in these circumstances may have *negative* public consequences, inducing departments to curtail the kinds of beneficial activities — such as "community policing" — that place officers in isolated situations with members of the public, or encouraging them to take defensive measures such as two-person police patrols, however costly to the public. See *id.* at 451 (sexual assaults such as that in *Mary M.* "realistically cannot be prevented without causing negative consequences for law enforcement").

¶ 74. Equally misguided is the majority's reliance on the notion that vicarious liability serves the interest of spreading the "costs of police misconduct" among those who benefit "from the lawful exercise of police power." *Ante*, at ¶ 39. Risk spreading assumes that the employer can reasonably anticipate the loss and pass the cost of injuries to the beneficiaries of the enterprise in the form of higher rates or prices. See G. Calabresi, *Some Thoughts on Risk Distribution and the Law of Torts*, 70 Yale L.J. 499, 543-44 (1961). Public agencies such as police departments or school districts, however, cannot raise their prices, and, short of increasing already overwhelming property tax burdens, their only option may be to cut funding elsewhere. See Note, *supra*, 28 U.S.F. L. Rev. at 456 ("Imposition of vicarious liability could have the effect of taking away funding to pay judgments that would otherwise be allocated to pay for police services."); see also *TBH v. Meyer*, 168 Vt. 149, 154, 716 A.2d 31, 35 (1998) (if insurer were required to cover costs of insured's sexual misconduct, causing other policy holders to bear expense of passed along costs, "[t]he average person . . . would cringe at the very suggestion") (citation omitted).

¶ 75. It has also been suggested that vicarious liability is necessary in these kinds of situations to ensure the compensation of tort victims. *Mary M.*, 814 P.2d at 1348-49. But is it really necessary or fair to impose liability without fault when the opportunity exists to hold employers directly liable if it can be proven that they were negligent in hiring, training, or supervising the tortfeasor? See *Brueckner*, 169 Vt. at 126, 730 A.2d at 1093 (principal may be held directly liable for damages resulting from negligent supervision of employee); *TBH*, 168 Vt. at 154, 716 A.2d at 35 (although denying coverage for sexual misconduct "will deny [victim] a potential source of compensation . . . [e]nsuring compensation of the victim . . . is outweighed by precisely

fixing both moral and economic liability"). While theoretical arguments could be made on both sides of the issue, the record in this case is devoid of any actual evidence to inform the Court's decision.

¶ 76. Finally, in addition to the foregoing, the majority implies that support for the imposition of vicarious liability in these circumstances may be found in cases such as *Red Elk v. United States*, 62 F.3d 1102, 1107 (8th Cir. 1995), which held that a sexual assault by an on-duty police officer may be sufficiently "foreseeable" to fall within the scope of employment and therefore may be attributable to the employer. The proposition that it is *foreseeable* that a police officer may sexually assault an innocent victim merely because the officer has the power or the opportunity to do so has been soundly rejected by other courts. See, e.g., *Bates v. United States*, 701 F.2d 737, 741-42 (8th Cir. 1983); *Gambling v. Cornish*, 426 F. Supp. 1153, 1154-55 (N.D. Ill. 1977); *Boykin v. Dist. of Columbia*, 484 A.2d 560, 562 (D.C. 1984); *Bates v. Doria*, 502 N.E.2d 454, 457-58 (Ill. App. Ct. 1986). As Justice George aptly observed in *Farmers*, "it is one thing to say that a public entity must expect that some police officers will abuse their authority by, for example, using excessive force in effectuating an arrest or detention and quite another to conclude that a public entity must expect that some officers will rape women they have detained." 906 P.2d at 461 (George, J., concurring).[10]

¶ 77. While purporting to rely on the "unique" power exercised by on-duty police officers, the majority opinion fails to explain why this provides a reasoned basis for departing from the usual rules of respondeat superior for law enforcement agencies, and more disturbingly fails to set forth any basis to distinguish a police officer's "power" from that of other employees in analogous positions of authority over vulnerable populations. It is no excuse to assert — as the Court does here — that the decision is intended to be "narrow" and not "venture beyond what is necessary to decide the case," *ante*, at ¶ 47, when the potential costs of doctrinal inexactitude are so great.

---

[10] In *Red Elk v. United States*, 62 F.3d 1102, 1104 (8th Cir. 1995), the thirteen year old victim was picked up by a tribal officer and raped in the officer's cruiser. The court of appeals described "five more incidents of intercourse" with the victim in which "in some instances the victim voluntarily submitted" until she later "put an end to the relationship." *Id.* at 1104. To describe the multiple sexual assaults of a thirteen-year-old girl by a grown man as a "relationship" and suggest that she "voluntarily submitted" discredits the opinion's overall analysis.

¶ 78. Even in the relatively "narrow" employment context of law enforcement agencies the majority provides no clear basis to limit the imposition of vicarious liability. The majority rejects the notion of imposing "strict liability" on the Department for the criminal acts of its employees, see *ante*, at ¶ 13, yet provides no reasoned basis to distinguish this case from any other involving police misconduct. The police officer's "access" to the victim in this case was no different from any other patron of the convenience store, and the idea that a police cruiser parked in front would "deter" others from entering the store, *ante*, at ¶ 52, is pure speculation. Furthermore, nothing in the record suggests that the assault was particularly facilitated by Deputy Forrest's "authority" as a law enforcement officer; any other assailant with a handgun and the physical power could have committed the same offense. Thus, while the majority purports to reject the notion that simply owning a badge, gun, and uniform are enough to create vicarious liability its holding suggests exactly the reverse.

¶ 79. Recently, in *Smith v. Parrott*, 2003 VT 64, ¶ 7, 175 Vt. 375, 833 A.2d 843, this Court was presented with a similar opportunity to broadly expand the potential tort liability of a profession, in that case physicians and other health care professionals, by departing from the traditional causation standard and adopting the so-called "loss of chance" doctrine. While acknowledging that the doctrine had received substantial support among legal commentators and had been accepted in a number of jurisdictions, we nevertheless cautioned that its adoption here raised "fundamental questions about its potential impact on not only the cost, but the very practice of medicine in Vermont; about its effect on . . . other professions and the principles — if any — which might justify its application to medicine but not other fields." *Id.* at ¶ 13. Confronted with these uncertainties, we concluded that the decision "'involves significant and far-reaching policy concerns' more properly left to the Legislature, where hearings may be held, data collected, and competing interests heard before a wise decision is reached." *Id.* at ¶ 14 (quoting *Crosby v. United States*, 48 F. Supp. 2d 924, 931 (D. Alaska 1999)). I submit that prudence dictates a similarly cautious approach here, where the issues are even more complex, the ramifications for the public welfare and safety even greater, and the Court's obvious lack of information for policy formulation that much more significant. See *Niece*, 929 P.2d at 430-31 (declining to impose vicarious liability on group home for employee's rape of resident because "complex questions of public policy" as to how the cost of such liability would be borne and how it would affect residential care

"dictates that we defer to the Legislature"). The better part of wisdom here is to defer to the Legislature, which is uniquely equipped to engage in the "fact-finding and problem-solving process" necessary to an informed and balanced decision on the question of whether a police department may be held vicariously liable for an intentional sexual assault committed by an officer. *Hillerby v. Town of Colchester*, 167 Vt. 270, 276, 706 A.2d 446, 449 (1997). I would, therefore, affirm the summary judgment of the trial court in favor of defendants.

¶ 80. I am authorized to state that Chief Justice Amestoy joins this dissent.