United States Court of Appeals,

Fifth Circuit.

No. 91-1290.

ENTENTE MINERAL COMPANY, Plaintiff-Appellant,

v.

Derek E. PARKER, et al., Defendants,

Pat M. Barrett, et al., Defendants-Appellees.

March 31, 1992.

Appeal from the United States District Court for the Southern District of Mississippi.

Before THORNBERRY, GARWOOD, and DAVIS, Circuit Judges.

THORNBERRY, Circuit Judge:

This is an appeal from a directed verdict. The defendant-appellee law firm was sued for vicarious liability. The district court directed a verdict in favor of the firm, concluding as a matter of law that the jury could not find vicarious liability. The plaintiff-appellant, Entente, appeals the district court's directed verdict. We find that the jury could not have found vicarious liability and the directed verdict in favor of the firm was proper.

## I. Background

In February 1987, H.B. Sneed ("Sneed"), a petroleum landman employed by Entente Mineral Company ("Entente"), negotiated with McKinley Young ("Young") to purchase one-half of Young's royalty interest in certain property. On February 23, Young and Sneed

orally agreed that Entente would purchase one-half of Young's interest for $25,000. Sneed then presented a $25,000 draft and a royalty deed to Young. Young, who does not read well if at all, stated that he wanted his banker, Bruce Edwards, ("Edwards") to review the deed to ensure that it accurately reflected the terms of the oral agreement. Young and Sneed took the deed to Edwards, who suggested that Young's attorneys at the firm of Barrett, Barrett, Barrett, and Patton ("the firm") review the deed. Edwards telephoned Derek Parker, a partner in the firm, and arranged for Sneed and Young to meet with Parker.

That afternoon, Sneed and Young drove to the firm and met with Parker. Parker reviewed the deed and told Young that the deed reflected the terms and conditions of the oral agreement. He also advised Young that before signing the deed, he should have a title search performed to guarantee that he owned a one-sixteenth royalty, the one-half of one-sixteenth that he intended to sell to Entente and the one-half of one-sixteenth that he intended to retain. Young then asked Parker to perform the title search. Parker instructed Sneed and Young to return the next day at one o'clock p.m. to close the deal. Sneed left the royalty deed and the $25,000 draft with Parker.

After Sneed and Young left the firm, Parker telephoned his brother, who was an oil and gas lease and royalty speculator. Parker asked his brother whether he knew about a well being drilled on Young's property. After doing some research, Parker's brother

informed him that the well looked promising and that he would provide financing to Parker if he attempted to purchase the royalty from Young. Parker's brother suggested offering Young $30,000 for the one-half royalty. Parker replied that he did not want to pay $30,000 and that he could probably buy it for $27,000. Later that day, Parker asked his partner Pat Barrett, Jr. whether he thought there was anything wrong with a lawyer's purchasing mineral interests from a client, and Barrett replied that he did not see anything wrong with it.

The following morning, Parker called Edwards and told him that he knew of someone who could make Young a better offer. He asked Edwards to have Young contact him. Young returned Parker's call and the two agreed to meet that afternoon at Edwards's bank. Once at the bank, Parker informed Young that he wanted to purchase the one-half royalty for $27,000. Young agreed, and they executed the same deed that Sneed had prepared except that Parker's name appeared in the Grantee blank.

When Sneed arrived at the firm, prepared to close the sale, he was informed that Young had received a better offer for the one-half royalty. Sneed asked who purchased the one-half royalty but was not given an answer. Eventually, Sneed discovered from the officially recorded deed that Parker had purchased the one-half royalty.

In June, 1987, Entente sued Parker and the firm in federal

district court based on diversity jurisdiction. Entente asserted that Parker's actions constituted tortious interference with business relations and contract in violation of Mississippi law, and that the firm was vicariously liable for Parker's tortious conduct. The court held a jury trial. At the close of Entente's evidence, the firm moved for a directed verdict on the ground that Parker's purchase of the royalty was not within the scope of his employment, and hence, the firm could not be vicariously liable for any tort he may have committed in purchasing the royalty. The district court concluded that Parker had not been acting within the scope of his employment when he purchased the royalty and granted the firm's motion for directed verdict.

Shortly after the directed verdict, Entente and Parker reached a settlement agreement. The court entered an Agreed Judgment under which Entente settled all claims against Parker, but reserved all rights against the firm and the individual partners. Entente now appeals the district court's grant of the firm's motion for directed verdict.

## II. Analysis

### A. The Standard of Review

In diversity cases, federal courts apply a federal test to determine whether it is proper to direct a verdict. *Boeing Company v. Shipman,* 411 F.2d 365, 368 (5th Cir.1969) (en banc). The

inquiry is the same at the trial court level and at the appellate level: "[i]f the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion[ ] is proper." *Boeing,* 411 F.2d at 374; *Fruge v. Penrod Drilling Co.,* 918 F.2d 1163, 1166 (5th Cir.1990). Furthermore, the evidence must be viewed in the light and with all reasonable inferences most favorable to the party opposing the directed verdict.[1] *Fruge,* 918 F.2d at 1165.

B. Governing Law

Mississippi law applies in this diversity case. Accordingly, the law firm's vicarious liability for Parker's conduct is assessed under agency principles. *See Miss.Code Ann.* § 79–12–17 ("Every partner is an agent of the partnership for the purpose of its business...."); *Id.* § 79–12–25 ("Where, by any wrongful act ... of any partner acting in the ordinary course of business of the partnership ... loss or injury is caused to any person ... the partnership is liable therefor to the same extent as the partner so acting...."). We are also guided by the Restatement (Second) of Agency, as the Mississippi Supreme Court has cited with approval various sections of the treatise. *See e.g., Short v. Columbus Rubber and Gasket Co.,* 535 So.2d 61, 67 (Miss.1988) (citing § 456); *Marter v. Scott,* 514 So.2d 1240, 1242 (Miss.1987) (citing § 228).

---

[1]The relevant facts are not in dispute in this case.

## C. Vicarious Liability

Section 219 of the Restatement (Second) of Agency discusses the circumstances in which a master or principal is liable for the torts of his servant or agent.  Subsection (1) of § 219 provides that a principal or master is vicariously liable for the torts of his agent or servant that are committed within the scope of employment.  RESTATEMENT (SECOND) OF AGENCY § 219(1) (1958).  An agent or employee's conduct is within the scope of employment only if

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

RESTATEMENT (SECOND) OF AGENCY, § 228 (1958).  Section 228 of the Restatement, which the Mississippi Supreme Court adopted in *Sears Roebuck & Co. v. Creekmore,* 199 Miss. 48, 23 So.2d 250, 251 (1945), clearly requires that, in order to be within the scope of employment, the agent's conduct must be actuated, at least in part, by a purpose to serve the master.

Subsection (2) of § 219 lists four situations in which conduct that fails to satisfy the "within the scope of employment" test found in § 228, may still provide a basis for imposing vicarious liability.  Subsection (2) provides in part that

(2) A master is not subject to liability for the torts of his servants acting outside the scope of employment, unless:

. . . . .

(d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

Thus, under the Restatement, a principal is liable for the torts of his agent if the agent commits the tort while acting within the scope of his employment as defined by § 228, or if § 219(2) applies. The situations listed in § 219(2) are not necessarily exceptions to the scope of employment doctrine, but rather situations in which courts have decided to impose liability on the principal or employer even if the agent's conduct does not meet all of the traditional "within the scope of employment" criteria.

Section 261 is an extension of § 219(2)(d), and states that

A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud.

Comment a to § 261 states that

The principal is subject to liability under the rule stated in this section although he is entirely innocent, has received no benefit from the transaction, and as stated in Section 262, although the agent acted solely for his own purposes.

Unlike § 228, § 261 assesses vicarious liability even though the agent's conduct was not actuated by a purpose to serve the principal. Although Mississippi case law has not expressly differentiated between the two types of vicarious liability found in § 219(1) and § 219(2) of the Restatement, the distinction is

implicit.[2]  Hence, cases imposing liability under the theory

embraced by § 219(1) and defined in § 228, require the agent's

conduct to be for the principal's purposes;  while other cases,

under the theory embodied in §§ 219(2)(d) and 261, allow liability

even when an agent acts solely for his own purposes.  *Compare*

*Seedkem South Inc. v. Lee,* 391 So.2d 990, 995 (Miss.1980) *with*

*Billups Petroleum Co. v. Hardin's Bakeries Corp.,* 217 Miss. 24, 63

So.2d 543 (1953) *and Napp v. Liberty National Life Insurance Co.,*

248 Miss. 320, 159 So.2d 164 (1963).


Recognizing the distinction between the types of liability, we

first address whether Parker's purchase of the royalty was within

the scope of his employment as defined by § 228, and second,

whether the firm can be held liable under the theory delineated in

§ 261.[3]

---

[2]Entente, however, conflates the two theories, arguing that it is not necessary that Parker's acts be for the firm's benefit to be within the scope of his employment under § 228, but citing *Billups Petroleum Co. v. Hardin's Bakeries Corp.,* 217 Miss. 24, 63 So.2d 543 (1953), a case in which the theory of liability is of the type embodied in § 219(2)(d).

[3]Entente alleges four points of error:  (1) the district court erred in concluding that Parker's wrongful act was not within the scope of his employment because it was not motivated by a purpose to benefit the firm;  (2) the district court erred by concluding that Parker's purchase of the royalty was separated by time and sequence from other acts within the scope of his employment;  (3) the district court required actual negligence by the firm for vicarious liability;  (4) the district court erroneously focused on the purchase itself rather than the entire context of the transaction in determining that the purchase was separated by time and sequence from acts within the scope of Parker's employment.

This opinion is not organized around the four points of error but rather around the two applicable theories of vicarious liability.  Entente's first, second, and fourth

*1. Was Parker's Conduct Within the Scope of His Employment?*

The district court concluded that Parker's purchase of the royalty from Young was an "abandonment of employment" and therefore, not within the scope of his employment with the firm. (Tr. at vol. 8, p. 441). Entente does not dispute that the firm is not in the business of buying minerals or that the firm received no gain from Parker's purchase of the royalty. Instead, Entente asserts that the district court improperly focused on the last event, the purchase itself, and that if the transaction is viewed in the proper context, Parker's conduct satisfies each element of § 228.

In essence, Entente contends that Parker purchased the royalty while acting as Young's attorney, and was motivated by the firm's purposes both when he agreed to meet with Young, a longstanding client, and when he agreed to perform the title search. Entente maintains that Parker's conduct, from the time he agreed to meet with Young to the time he purchased the royalty, is only one series of conduct that cannot be separated into distinct acts; in Entente's words, Parker's "legal engagement could not be turned on and off." (Appellant's Br. at 32).

---

points of error are discussed within the appropriate sections of the opinion. We do not discuss Entente's third point of error because the district court did not require actual negligence by the firm, but merely commented that Parker's nebulous question to Pat Barrett, Jr. did not put the firm on notice of Parker's intent to purchase the royalty from Young.

Entente would have us hold that once Parker began representing Young pursuant to the firm's purposes, no deviation from the firm's purpose could take him outside the scope of his employment. Such a holding would violate the well established rule that

> if an employee who is delegated to perform certain work for his employer steps or turns aside from his master's work or business to serve some purpose of his own, not connected with the employer's business, or, as it is often expressed, deviates or departs from his work to accomplish some purpose of his own not connected with his employment—goes on a "frolic of his own'—the relation of master and servant is thereby temporarily suspended, and the master is not liable for his acts during the period of such suspension; ....

*Seedkem South, Inc. v. Lee,* 391 So.2d 990, 995 (Miss.1987). As the "abandonment of employment" doctrine is entrenched in the law of vicarious liability, we conclude, as the district court did, that the proper inquiry is whether, at the time of the purchase, Parker was acting within the scope of his employment.

There is no dispute that Parker purchased the royalty for himself and was acting in his own interest, not in the interest of the firm. (Tr. at vol. 7, p. 230.) There is also no dispute that the firm did not receive any benefit from Parker's purchase of the royalty. (*Id.*). In fact, Young was never billed by Parker or the firm. (Tr. at vol. 7, p. 231–232). In order to satisfy the § 228 definition of "within the scope of employment," Parker's conduct must have been motivated, at least in part, by a desire to serve the firm. It is undisputed that Parker was motivated only by a desire to serve himself when he purchased the royalty. Viewing the conduct from the proper perspective, as a matter of law, Parker

could not have been acting within the scope of his employment when he purchased the royalty interest.

*2. Did the Agency Relationship Aid Parker in Committing Allegedly Tortious Acts, Within the Meaning of §§ 219(2)(d) and 261?*

Entente claims that two cases, *Billups Petroleum Co. v. Hardin's Bakeries Corp.,* 217 Miss. 24, 63 So.2d 543 (1953), and *Napp v. Liberty National Life Insurance Co.,* 248 Miss. 320, 159 So.2d 164 (1963), support its argument that conduct need not be motivated by any desire to serve a master in order to be within the scope of a servant's employment. As discussed above, Entente's argument conflates two theories of liability.[4] We examine the *Billups* and *Napp* cases, however, to determine whether the type of liability anticipated by § 261 exists in this case. After a careful examination of the cases and the underlying theories of liability, we find that as a matter of law, the liability described in §§ 219(2)(d) and 261 does not exist in this case.

In *Billups,* a salesman for Hardin's Bakeries overcharged Billups for bread over a period of several months, and kept the excess for himself. The Mississippi Supreme Court held Hardin's Bakeries vicariously liable for its agent's fraud, stating that

---

[4]Although the holding of the *Billups* case is framed in "scope of employment" language, upon close examination, the underlying theory of liability is that expressed in § 219(2)(d) of the Restatement. *See* RESTATEMENT (SECOND) OF AGENCY § 219 cmt. e (1958).

> [t]he Principal is liable to third persons for injuries resulting from the fraud and deceit of his agent if such is within the scope of the agent's authority. Acts of fraud by the agent, committed in the course or scope of his employment, are binding on the principal, even though the principal did not know of or authorize the commission of the fraudulent acts, and although he derives no benefit from the success of the fraud, and the agent committed it for his own benefit.

*Billups,* 63 So.2d at 546. Contrary to some of the language in the *Billups* case, the principal's liability is based on the theory embodied in §§ 219(2)(d) and 261 of the Restatement, rather than traditional "scope of employment" liability contained in § 219(1). The four cases the *Billups* court discusses in support of its holding evidence that the court imposed § 219(2)(d) liability. Each of the four cases involves fraud by an agent upon the principal's customer. Each case involved a situation in which the principal delegated to the agent the power to perform a certain task, such as collect monies for the principal. In each case, the agent acted for his own purposes, but the fraud transpired as part of the very duty that the principal authorized the agent to perform. Because the customers had a relationship with the principal that induced the customers to rely on the principal's agent, and the agent defrauded the customers in the performance of the duty entrusted to him by the principal, the agent was "aided in accomplishing the tort by the existence of the agency relation." RESTATEMENT (SECOND) OF AGENCY, § 219(2)(d) (1958).

In *Napp,* the insurance company's agent defrauded a beneficiary by painstakingly convincing her that her husband's policy had lapsed before his death, but that the insurance company would pay

half of the benefit she otherwise would have been due. In fact, the policy had not lapsed, and when the agent delivered a check for the full amount of the benefit to the beneficiary, he told her that the check had been made out for the incorrect amount, and that she would have to give half of it back to him to return to the company. He induced her to sign a receipt for the full amount and he kept one half of the money for himself. The court found that even though this conduct was not within the scope of the agent's employment contract, the company elected to have the agent deliver the check, and "could not delegate to one certain duties and then deny agency because the written contract between them limited his activities to other matters." *Napp,* 159 So.2d at 166. Thus, as in *Billups,* the fraud in *Napp* transpired as part of the very duty that the agent was authorized to perform for the principal and customer.

Entente contends that, just as in *Billups* and *Napp,* Parker was aided in purchasing the royalty by the existence of his agency relationship with the firm. Entente advances that but for his employment at the firm, Parker never would have met Young and never would have had the opportunity to purchase the royalty; yet, but-for causation is irrelevant in this case. The proper inquiry for determining vicarious liability of a principal whose agent defrauds the principal's customer is the relationship between the principal and the customer. In *Billups,* the four cases it discusses, and *Napp,* the principal had a relationship with the customer and the customer was defrauded by the principal's agent. The courts reasoned that a principal who provides his agent with

the tools or position necessary to perpetrate a fraud on the principal's customers, should be held responsible to the innocent customers who relied on the agent.  In this case, there was no relationship between the firm and Entente that could be imputed to the firm's agent.  It is undisputed that neither Parker nor the firm represented Entente.  (Tr. at vol. 6, p. 156).  The premise underlying § 219(2)(d) and § 261 liability, a relationship between the principal and an innocent third party, is absent in this case. Therefore, as a matter of law, the firm could not have been held vicariously liable for Parker's acts.

We AFFIRM the verdict directed by the district court.