# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2009-CA-00182-SCT

*WALTER AKINS d/b/a AKINS CONSTRUCTION COMPANY*

*v.*

*GOLDEN TRIANGLE PLANNING & DEVELOPMENT DISTRICT, INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/18/2008 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | J. NILES McNEEL |
| ATTORNEYS FOR APPELLEE: | TOMMIE SULLIVAN CARDIN |
| | WILLIAM M. GAGE |
| | PAUL MICHAEL ELLIS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 05/13/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     Walter Akins d/b/a Akins Construction Company (Akins) filed suit in the Circuit Court of Oktibbeha County against Golden Triangle Planning and Development District, Inc. (Golden Triangle) under the theory of *respondeat superior,* seeking, *inter alia*, $80,628, an amount that he claimed represented profits owed to him for constructing homes under the federal government's HOME Investment Partnerships Program (HOME), which was administered locally by Golden Triangle. According to Akins, the profits to which he was

entitled were embezzled by a Golden Triangle employee, Phyllis Tate. Upon both parties filing motions for summary judgment, the trial court denied Akins's motion for summary judgment and granted summary judgment in favor of Golden Triangle. Consistent with these actions, the trial court entered final judgment in favor of Golden Triangle, thus dismissing Akins's claims with prejudice. Aggrieved by the trial court's judgment, Akins timely filed this appeal.

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2.     Golden Triangle is a nonprofit economic-development corporation headquartered in Starkville. Golden Triangle serves the counties of Choctaw, Clay, Lowndes, Noxubee, Oktibbeha, Webster, and Winston. One of the programs managed by Golden Triangle is the HOME program, which is under the auspices of the Department of Housing and Urban Development (HUD). The HOME program is aimed at providing affordable housing for rent or ownership to low-income individuals. Within Golden Triangle's Community Enrichment Division is the Housing Department, and, at all relevant times herein, Phyllis Tate (Tate) was employed by Golden Triangle as a Housing Specialist within the Housing Department. Tate's duties included enrolling the seven participating counties in the HOME program; assisting counties and municipalities in selecting eligible participants; advertising and soliciting bids from third-party contractors to construct the houses; verifying that the most competitive participants were awarded the bids; reviewing inspector reports certifying percentage of work completed on houses; and submitting requests to the Mississippi Development Authority for disbursement of money to counties and municipalities for payment to the contractors.

2

¶3.     In general, the process began with Tate assisting the counties and municipalities in applying for HOME funds. For those applications which were approved, the HOME funds were allocated to the counties and municipalities. Tate worked with potential homeowners to select house plans and general contractors. The future homeowners then contracted with the builders, and these contracts ultimately had to be approved by Golden Triangle. When building began, Tate received invoices from contractors and requested cash allotments from the counties and municipalities, which, in turn, paid the invoices with HOME funds.[1]

¶4.     Eventually, Tate began a scheme in which she colluded with her daughter and her daughter's then-boyfriend, Jason Clark, to divert HOME funds by transferring profits from the building projects to the checking account of a shell corporation, J-Max Construction Company, purportedly owned by Clark. In reality, J-Max was created for the fraudulent purpose of receiving the illegally diverted HOME funds. Tate convinced future homeowners to contract with builders with whom she purportedly had been working. Tate then requested cash allotments for J-Max Construction Company. The county or municipality receiving the grant funds wrote checks to J-Max. Tate, Clark, or Tate's daughter would withdraw the necessary funds to pay the subcontractors. When building was complete, Tate incorporated

---

[1]As can be presumed from this recitation of the facts, numerous contracts/documents most likely exist to memorialize the duties and obligations of Golden Triangle in its relationship with HUD and the duties and obligations of the general contractors in their relationships with Golden Triangle and the individual homeowners; however, none of these documents appear in the appellate record before us in this case.

into the withdrawals the profits which should have been paid to the general contractor who actually had performed the work.

¶5. Akins was one of the general contractors who built homes under the HOME program administered by Golden Triangle. Akins was paid a total of $820,000 with HOME funds for various construction projects. Akins contracted with prospective homeowners to construct their residences. Golden Triangle approved these contracts. Akins requested periodic payments and a final payment upon completion. At Golden Triangle's request, Akins was paid for his services.

¶6. In August 2005, Golden Triangle suspected that Tate and/or Akins was involved in fraudulent activity after learning that Akins was charging building supplies to an account opened by Tate on behalf of a county at an area building supply warehouse, thereby avoiding sales tax on the building supplies. A forensic certified public accountant, hired by Golden Triangle, investigated and determined that Tate was embezzling HOME funds.

¶7. Upon receiving this information from the forensic CPA, Golden Triangle reported Tate's actions to the local district attorney, the Mississippi State Auditor, and the Mississippi Development Authority. In due course, the Federal Bureau of Investigation conducted its own investigation, ultimately resulting in a forty-seven-count federal grand jury indictment being handed down in the United States District Court for the Northern District of Mississippi. Some of the overt acts asserted by the government in this indictment were as follows:

4

3. PHYLLIS TATE created fraudulent requests for cash purportedly for J-Max Construction Company, a company supposedly building low income housing in Weir, Webster County, Choctaw County, Eupora, Winston County, Oktibbeha County, Macon, and Noxubee County, Mississippi.

4. J-Max Construction Company received funds for low income housing it did not build, but funds provided by the Housing and Urban Development Administration were nevertheless paid as a result of the fraudulent requests for cash.

5. J-Max Construction was purportedly a construction company operated by JASON CLARK, KEINA TATE'S then-boyfriend. The company and its checking account were created for no reason other than to funnel money designated to build low income housing into the pockets of JOSH BROWN, JASON CLARK, KEINA TATE, and PHYLLIS TATE.

6. KEINA TATE and JASON CLARK were the only individuals with signatory authority for J-Max Construction's checking account, and once the funds from the town, city, or county were deposited into the account either KEINA TATE or JASON CLARK would withdraw a portion of those funds and transfer them to PHYLLIS TATE either by paying her cash or transferring it to one of PHYLLIS TATE'S personal accounts, including, but not limited to, PHYLLIS TATE'S Curry Club account, a non-business account in Phyllis Tate's maiden name. KEINA TATE and JASON CLARK also retained a portion of the funds deposited into the J-Max Construction account.

7. At times pursuant to the dictates of the program, cash may not be distributed without an inspector providing information related to the progress of the construction. To make certain the fraudulent cash requests were honored, JOSH BROWN would provide fraudulent building inspection statements, stating that he had inspected the particular homes when he had not done so. On more than one occasion JOSH BROWN provided statements that construction of particular homes had progressed to a stage that would allow additional disbursements when in fact the structure was not yet started. JOSH BROWN received payment from the funding at issue for each fraudulent statement he provided.[2]

---

[2]Eventually, Tate pleaded guilty in the United States District Court for the Northern District of Mississippi, Chief Judge Michael P. Mills presiding. Pursuant to a plea agreement, Tate pleaded guilty to Count 47 of the indictment, which asserted, inter alia, that

5

¶8. On December 12, 2006, Akins filed suit against Golden Triangle in the Circuit Court of Oktibbeha County. In his complaint Akins alleged that the amount of $80,628 was embezzled by Tate, but actually owed to him for his services, and that Golden Triangle was vicariously liable under the doctrine of *respondeat superior*.[3] Akins alleged that payments made to J-Max were for construction that he completed.

¶9. In due course, both Akins and Golden Triangle filed motions for summary judgment. The Circuit Court of Oktibbeha County, Judge Lee J. Howard presiding, denied Akins's motion for summary judgment and granted Golden Triangle's motion for summary judgment on the grounds that Tate was acting outside the scope of her duties in stealing government money and that Golden Triangle did not receive any benefit from Tate's illegal actions. From the trial court judgment entered in favor of Golden Triangle, Akins appeals to us.

## DISCUSSION

¶10. Akins presents to us the single issue of whether the circuit court erroneously granted Golden Triangle's motion for summary judgment.

---

Tate had conspired with Brown, Clark and Keina Tate to illegally convert federal funds for "the use of persons other than the rightful owner." From the record before us, we are unable to decipher what sentence was ultimately imposed upon Tate by Judge Mills.

[3]Notwithstanding the dissent's discussion, we have focused our discussion on the issue as couched in the parties' appellate briefs, that being whether damages are recoverable in today's case on the theory of *respondeat superior*. Mississippi Rule of Appellate Procedure 28(a)(6) states that "[t]he argument [in the brief] shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on."

¶11. A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Miss. R. Civ. P. 56(c). A grant of summary judgment is reviewed by this Court under the de novo standard. *Weathers v. Metropolitan Life Ins. Co.*, 14 So. 3d 688, 691 (Miss. 2009) (quoting *Bullard v. Guardian Life Ins. Co. of Am.*, 941 So. 2d 812, 814 (Miss. 2006)).

> The court views the evidence in the light most favorable to the nonmoving party. *Univ. of Miss. Med. Ctr. v. Easterling*, 928 So. 2d 815, 817 (Miss. 2006). "The moving party bears the burden of demonstrating there is no genuine issue of material fact." *Id.* This Court also has held that "[w]here there is doubt whether a fact issue exists, the non-moving party is the beneficiary of that doubt." *Allen v. Mac Tools, Inc.*, 671 So. 2d 636, 640 (Miss.1996).

*Weathers*, 14 So. 3d at 691.

¶12. Akins maintains that Golden Triangle is liable because the embezzlement was committed in the scope of Tate's employment. Golden Triangle argues that the acts committed by Tate were committed in furtherance of her own personal gain and not for the benefit of Golden Triangle or in the scope of her employment.

¶13. The trial court relied on the test[4] in *Commercial Bank v. Hearn*, 923 So. 2d 202 (Miss. 2006), for determining whether an employee was acting within the scope of

---

[4]The trial court opinion referred to a "three prong" test from *Hearn*, and erroneously omitted the fourth prong when citing to *Hearn*.

employment. In **Hearn,** this Court defined an employee's conduct as being in the scope of employment if:

> (a) it is of the kind he is employed to perform;
> (b) it occurs substantially within the authorized time and space limits;
> (c) it is actuated, at least in part, by a purpose to serve the master, and
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

*Id.* at 208 (citing **Marter v. Scott**, 514 So. 2d 1240, 1242-43 (Miss. 1987); Restatement (Second) of Agency § 228 (1958)). "Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." *Id.*

¶14.    The trial court found that Tate was employed for the purpose of transferring money from government entities into the accounts of builders. The trial court did not believe this scope of employment included stealing government money and routing it into her own personal account. Thus, according to the trial court, Tate's conduct satisfied only one prong of the **Hearn** test, inasmuch as the illegal acts occurred during the time she was working at Golden Triangle; however, Golden Triangle received no benefit from Tate's actions.

¶15.    The facts in **Hearn** are as follows: A bank employee was involved in an automobile accident that resulted in the injury of another driver and the death of an infant passenger. *Id.* at 203. The accident occurred during the employee's work hours while the employee was soliciting pledges for a United Way Campaign. The injured parties filed suit against both the employee and the bank based on the theory of *respondeat superior*. *Id.* at 204. This Court found that soliciting pledges was neither an act within the scope of employment nor an act

8

conducted in furtherance of any benefit to the bank; thus, the trial court's judgment denying Commercial Bank's motion for summary judgment was reversed and rendered. *Id.* at 208-210.

¶16. The second case the trial court cited was *Berhow v. The People's Bank*, 423 F. Supp. 562 (S.D. Miss. 2006). In *Berhow*, a loan officer fraudulently used bank customers' information to create fictitious loans and obtain funds for himself. One of the customers filed suit against the bank arguing that the bank was vicariously liable for its officer's actions. The trial court rejected this argument on the basis that the employee's fraud was for his own gain and of no benefit to the bank and that stealing funds from the bank was not within the scope of his employment. *Id*. at 575.

¶17. Akins argues that both of these cases concern employees involved in "an entirely personal act" and that such is not the case here. Akins alleges that Tate was acting within the scope of her duties in approving the disbursement of monies and building homes. Moreover, Akins alleges that Tate diverted Akins's money to the J-Max account, paid subcontractors, and then kept Akins's profits for herself and her co-conspirators. Thus, according to Akins, Tate was still ensuring that the homes were built, which acts, at least in part, served the master.

¶18. Akins compares the facts of the present case with the facts in *Billups Petroleum v. Hardin's Bakeries Corp.*, 217 Miss. 24, 63 So. 2d 543 (1953), wherein a salesman was overcharging Billups for bread and keeping the difference for himself. Hardin's was found liable for its employee's theft. *Id.* at 548. Akins further cites *Napp v. Liberty National Life*

9

*Insurance Co.*, 248 Miss. 320, 159 So. 2d 164 (1963), wherein an insurance agent pocketed half of a beneficiary's dividends under a $1,000 life insurance policy with a double-indemnity clause in the event of accidental death. *Id.* at 164. The decedent had died in an automobile accident, and the decedent's widow was the beneficiary. *Id.* The insurance agent convinced the beneficiary that the policy had lapsed but that the company would pay her $1,000 under the policy. *Id.* at 165. When the agent presented her with a $2,000 check from the life insurance company, he persuaded her that this was an oversight and that she would be required to deposit $1,000 in her account, but give $1,000 dollars in cash back to the agent. *Id.* The company was held liable for the difference. *Id.* at 166.

¶19.    Golden Triangle contends that Akins's reliance on both *Billups* and *Napp* is misplaced, as these decisions have been eroded by more recent Mississippi Supreme Court decisions which have demonstrated a "marked shift away from expansive employer vicarious liability." Golden Triangle cites *Gulledge v. Shaw*, 880 So. 2d 288 (Miss. 2004), for the premise that when "a servant, having completed his duty to his master, then proceeds to prosecute some private purpose of his own, the master is not liable . . . ." *Id.* at 295. Golden Triangle further argues that Akins has failed to prove that he is owed any of the funds diverted by Tate to J-Max, and in turn, to herself and her co-conspirators. Alternatively, Golden Triangle maintains that, even if the facts averred by Akins are true, Golden Triangle still is entitled to judgment as a matter of law because Tate acted outside her duties for her own gain to the detriment – not the benefit – of her employer/master, Golden Triangle.

10

¶20. From the record before us, we find that the trial court did not err in granting Golden Triangle's motion for summary judgment, notwithstanding that genuine issues of fact exist, because Akins's claims fail as a matter of law. The trial court was correct in finding that Tate's misdeeds were for her own personal gain and were of no benefit to Golden Triangle. She took government money and funneled it into the J-Max account. Later, this money was put into Tate's personal account. Even if this money was earmarked for Akins, as a matter of law, Akins cannot be granted relief under a theory of *respondeat superior*. Given that Akins contracted with the homeowners themselves, and there exists no privity of contract between the parties, Akins is not entitled to relief from Golden Triangle.

## CONCLUSION

¶21. As a matter of law, Akins was not entitled to recover any funds from Golden Triangle, given that Golden Triangle's employee, Tate, embezzled money for her own personal gain and did not serve to mutually benefit Golden Triangle. Rather, such actions were to the detriment of Golden Triangle. For all the reasons stated, the trial court did not err in granting Golden Triangle's motion for summary judgment; therefore, the Oktibbeha County Circuit Court's final judgment entered in favor of Golden Triangle Planning & Development District, Inc., dismissing with prejudice all claims of Walter Akins d/b/a Akins Construction Company, is affirmed.

¶22. **AFFIRMED.**

**WALLER, C.J., GRAVES, P.J., KITCHENS AND PIERCE, JJ., CONCUR. RANDOLPH, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, LAMAR AND CHANDLER, JJ.**

11

**RANDOLPH, JUSTICE, DISSENTING:**

¶23. As no employee's duty involves stealing, the Majority, like the circuit court, properly concludes that Tate's fraudulent conduct was not "within the scope of employment," as her "misdeeds were for her own personal gain and were of no benefit to Golden Triangle." (Maj. Op. at ¶ 21). Unfortunately, the vicarious-liability analysis of both the Majority and the circuit court is limited to the *respondeat superior* standard outlined in Section 228 of the Restatement (Second) of Agency. In cases involving employee negligence or wrongful conduct, like those relied upon by the Majority,[5] such an analysis is quite appropriate. However, "[s]cope of employment does not define the only basis for employer liability under agency principles. In limited circumstances, agency principles impose liability on employers even where employees commit torts outside the scope of employment. The principles are set forth in the much-cited § 219(2) of the Restatement . . . ." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 758, 118 S. Ct. 2257, 2267, 141 L. Ed. 2d 633 (1998). *See also Jones v. B.L. Dev. Corp.*, 940 So. 2d 961, 967 (Miss. Ct. App. 2006) (citation omitted) ("[a] master is subject to liability for the torts of his servant committed outside the scope of employment if the servant was aided in accomplishing the tort by the existence of the agency relation.");

---

[5]*See Commercial Bank v. Hearn*, 923 So. 2d 202 (Miss. 2006); *Gulledge v. Shaw*, 880 So. 2d 288 (Miss. 2004). *See also Seedkem South, Inc. v. Lee*, 391 So. 2d 990, 994-95 (Miss. 1980) (a negligent-conduct case in which an employee's "nine hour beer drinking spree" was deemed a "frolic" outside the scope of his employment, such that Seedkem South could not be held liable under *respondeat superior*).

12

*Faragher v. City of Boca Raton*, 524 U.S. 775, 801-02, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

¶24.   In employee theft/dishonesty/fraud cases, such a different analysis is required.  *See Napp v. Liberty Nat'l Life Ins. Co.*, 248 Miss. 320, 159 So. 2d 164 (1963); *Billups Petroleum Co. v. Hardin's Bakeries Corp.*, 217 Miss. 24, 63 So. 2d 543 (1953).  In cases of this genre, the standards outlined in Sections 219(2)(d) and 261 of the Restatement (Second) of Agency apply.  Considering those Restatement sections, in the context of the record presented, I conclude that genuine issues of material fact exist regarding whether Tate was "aided in accomplishing the tort by existence of the agency relation" such that Golden Triangle could be held vicariously liable for Tate's fraudulent conduct.  Restatement (Second) of Agency § 219(2)(d) (1958).  As such, the circuit court erred in granting Golden Triangle's motion for summary judgment.

¶25.   According to Akins's complaint, "Tate was acting as an *employee and agent* of Golden Triangle and *therefore, Golden Triangle is liable for the actions of [Tate]* in wrongfully directing . . . monies be paid to J-Max Construction."  (Emphasis added.)  No reference to *respondeat superior* is made.  Golden Triangle later summarized Akins's cause of action in its "Memorandum of Authorities in Support of Defendant's Motion for Summary Judgment," when it stated that "Akins'[s] sole theory of recovery against Golden Triangle is that Tate was *employed* by Golden Triangle when the funds were allegedly directed, and that Golden Triangle is *therefore liable* for the actions of Tate."  (Emphasis added.)  However, Golden Triangle then proceeded to conflate distinctive theories of vicarious

13

liability when it added "[i]n other words, Akins seeks to hold Golden Triangle vicariously liable under the doctrine of *respondeat superior*." In so doing, Golden Triangle effectively submersed the broader principle of vicarious liability to restrict its application to only one of its bases, *respondeat superior*.[6]

¶26. The circuit court and the Majority endorsed this restrictive application in their holdings, i.e., whether Tate's fraudulent conduct was "within the scope of employment," pursuant to the *respondeat superior* standard set forth in Section 228 of the Restatement (Second) of Agency. The Majority fails to address Sections 219(2)(d) and 261 of the Restatement (Second) of Agency, which control the case before us. *See* Restatement (Second) of Agency §§ 219(2)(d), 261 (1958).

¶27. Section 219(2) of the Restatement (Second) of Agency lists four situations in which conduct "outside the scope of . . . employment" provides a basis for imposing vicarious liability. Restatement (Second) of Agency § 219(2). According to Section 219(2)(d):

> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, *unless*:

---

[6]Akins incorrectly accepted this restriction and offered only the *respondeat superior*, Section 228 of the Restatement (Second) of Agency, argument, although he also raised the seminal cases that are dispositive of the issue before this Court. This Court cannot overlook that among the authorities cited by Akins in his "Memorandum of Authorities in Support of Plaintiff's Motion for Summary Judgment" and Appellant's Brief are employee theft/dishonesty/fraud genre cases, **Billups Petroleum** and **Napp**, which are directly on point with the issue before this Court. *See Napp*, 159 So. 2d at 164; **Billups Petroleum**, 63 So. 2d at 543. **Billups Petroleum** and **Napp** do not rely on a Section 228 analysis, but implicitly rely upon the analysis set forth in Sections 219(2)(d) and 261 of the Restatement (Second) of Agency, as discussed *supra*. *See* **Entente Mineral Co. v. Parker**, 956 F.2d 524, 527 (5th Cir. 1992).

14

. . .

(d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, *or he was aided in accomplishing the tort by the existence of the agency relation.*

*Id*. at § 219(2)(d) (emphasis added). "The first clause establishes an employer's vicarious liability for the torts of employees based on the doctrine of 'apparent authority,' while the second creates liability for an employer whose agent 'was aided in accomplishing the tort by the existence of the agency relation.'"[7] ***Doe v. Forrest***, 853 A.2d 48, 56 (Vt. 2004) (quoting Restatement (Second) of Agency § 219(2)(d)). "The commentary to the Restatement provides, by way of examples, that a telegraph company may be held liable for a tort committed by a telegraph operator who sends a false telegraph message, as may the undisclosed principal of a store whose manager cheats a customer." ***LaRoche v. Denny's,***

---

[7]In ***Faragher***:

[t]he City . . . argue[d] that the second qualification of the subsection, referring to a servant "aided in accomplishing the tort by the existence of the agency relation," merely "refines" the one preceding it, which holds the employer vicariously liable for its servant's abuse of apparent authority . . . . But this narrow reading is untenable; it would render the second qualification of § 219(2)(d) almost entirely superfluous (and would seem to ask us to shut our eyes to the potential effects of supervisory authority, even when not explicitly invoked). The illustrations accompanying this subsection make clear that it covers not only cases involving the abuse of apparent authority, but also cases in which tortious conduct is made possible or facilitated by the existence of the actual agency relationship.

***Faragher***, 524 U.S. at 801-02. *See also* ***Ellerth***, 524 U.S. at 759-60 (distinguishing the two theories outlined in Section 219(2)(d)).

15

*Inc.*, 62 F. Supp. 2d 1366, 1373 (S.D. Fla. 1999) (citing Restatement (Second) of Agency § 219 cmt. (e)).

¶28.   Section 261 of the Restatement (Second) of Agency provides that "[a] principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud."  Restatement (Second) of Agency § 261.  Comment (a) to Section 261 adds that:

> [t]he *principal* is *subject to liability* under the rule stated in this Section *although he is entirely innocent, has received no benefit from the transaction, and*, as stated in Section 262, *although the agent acted solely for his own purposes.  Liability is based upon the fact that the agent's position facilitates the consummation of the fraud*, in that *from the point of view of the third person* the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.

Restatement (Second) of Agency § 261 cmt. (a) (1958) (emphasis added).  *See also Entente Mineral*, 956 F.2d at 527 ("[u]nlike § 228, § 261 assesses vicarious liability even though the agent's conduct was not actuated by a purpose to serve the principal.").[8]

¶29.   In *Entente Mineral*, the Fifth Circuit noted that:

> [a]lthough Mississippi case law has not expressly differentiated between the two types of vicarious liability found in § 219(1) and § 219(2) of the

---

[8]The doctrines of *respondeat superior* and apparent authority do overlap, but not perfectly.  *See* Charles Davant IV, *Employer Liability for Employee Fraud: Apparent Authority or Respondeat Superior?*, 47 S.D. L. Rev. 554, 566, 568-69 (2002); *Grease Monkey Int'l, Inc. v. Montoya*, 904 P.2d 468, 473 (Colo. 1995) (citation omitted) ("[a]pparent authority liability is not based upon the rules of respondeat superior, and it is not 'essential to find that the agent was motivated by an intent to act for his master's purposes.'").

Restatement, the distinction is implicit.  Hence, *cases imposing liability under the theory embraced by § 219(1) and defined in § 228, require the agent's conduct to be for the principal's purposes; while other cases, under the theory embodied in §§ 219(2)(d) and 261, allow liability even when an agent acts solely for his own purposes.  Compare* [**Seedkem South**[9]] *with* [**Billups Petroleum**] *and* [**Napp**].

***Entente Mineral***, 956 F.2d at 527.

¶30.   In ***Billups Petroleum***, this Court stated that:

"[i]t is well settled that the principal is liable for the frauds and misrepresentations of his agent within the scope of the authority or employment of the agent, *even though he had no knowledge thereof and has received no benefit therefrom. . . .*"  2 Am. Jur. p. 281, Agency, § 362.  "The *principal is liable* to third persons for injuries resulting from the fraud and deceit of his agent *if such is within the scope of the agent's authority*.  Acts of fraud by the agent, committed in the course *or* scope of his employment, are binding on the principal, *even though the principal did not know of or authorize the commission of the fraudulent acts, and although he derives no benefit from the success of the fraud, and the agent committed it for his own benefit*."  3 C.J.S., Agency, § 257, p. 190.

***Billups Petroleum***, 63 So. 2d at 546 (emphasis added).  In holding Hardin's Bakeries vicariously liable for its agent's fraud, this Court determined that "the fraud was committed by the agent . . . while acting within the scope of his employment, and in our opinion the loss should fall on the principal who is liable for the act of the agent, and not upon the customer who has been defrauded."  *Id*. at 547-48.

¶31.   The four cases discussed and relied upon by this Court in ***Billups Petroleum*** were:

***Birkett v. Postal Telegraph-Cable Company***, 107 A.D. 115, 94 N.Y.S. 918 (N.Y.A.D. 4

Dept. 1905); ***Wilmerding v. Postal Telegraph-Cable Company***, 118 A.D. 685, 103 N.Y.S.

---

[9]*See* footnote 5, *supra*.

17

594 (N.Y.A.D. 1 Dept. 1907); ***Cleaney v. Parker***, 167 Ala. 134, 51 So. 951 (1910); and

***Berkovitz v. Morton-Gregson Company***, 112 Neb. 154, 198 N.W. 868 (1924). In ***Birkett***,

an agent of Postal Telegraph:

> padded the statements of a customer and over a period of years collected a large sum in excess of the true amount due. . . . The agent . . . retained the balance that he had wrongfully collected from the customer. . . . The court held that the agent was acting within the scope of his agency in receiving the money for the benefit of the defendant, and that the defendant was liable for the fraud perpetrated by its agent.

***Billups Petroleum***, 63 So. 2d at 547 (citing ***Birkett***, 94 N.Y.S. at 919-20). In ***Wilmerding***:

> the Court held that the plaintiff had a right to assume that the agents of the telegraph company admittedly employed by it and clothed with the power to collect money on the presentation of slips, were honest, and that the slips presented by them were genuine, and that where the defendant's messenger had forged slips and presented them to the plaintiff's cashier who paid them[,] the company was liable. The Court in that case said: "[a]n employer who has put it within the power of his employe[e] to defraud a third person by intermingling fraudulent and genuine bills and collecting money therefrom should be held responsible to an innocent third party for the dishonesty of his employe[e]."

***Billups Petroleum***, 63 So. 2d at 547 (quoting ***Wilmerding***, 103 N.Y.S. at 597). In ***Cleaney***,

the employer of a newspaper agency was held liable for money extorted from a customer in

excess of the price of the articles purchased. *See **Cleaney***, 51 So. at 952. The Alabama

Supreme Court:

> stated that while the agent may have exceeded, and probably did exceed his authority, and violated the instructions of his principal when he collected the extra money from the customer, "yet it was clearly within the line and scope of his authority in such manner as to render the defendants liable to plaintiff for such tort of the agent; *while it was the tort of the agent, as between him and his principals, it was the tort of both, as between them and the plaintiff.*"

18

*Billups Petroleum*, 63 So. 2d at 546 (quoting *Cleaney*, 51 So. at 952) (emphasis added). In

*Berkovitz*, a salesman for Morton-Gregson Company obtained merchandise orders from

Berkovitz. *See Berkovitz*, 198 N.W. at 868. Without Morton-Gregson Company's

knowledge or authorization, the salesman began altering Berkovitz's account statements to

show larger amounts than were actually due. *See id*. at 869. Such amounts were then

collected by the salesman from Berkovitz. *See id*. Thereafter:

> [i]n an action by Berkovitz against Morton-Gregson Company to recover the
> amount of the excess collections so made, the [Nebraska Supreme] Court held
> that [the salesman], in presenting the altered statements of account, was acting
> in the line of his employment and within the apparent scope of his authority,
> and that Morton-Gregson Company was liable to Berkovitz for his loss,
> occasioned by the fraud of [the salesman].

*Billups Petroleum*, 63 So. 2d at 547 (citing *Berkovitz*, 198 N.W. at 868).

¶32.   In *Napp*, this Court considered the argument of the defendant-life insurance company

"that the agent, if he was an agent, was acting without the scope of his authority real or

apparent, and that the company could not foresee that the agent would commit an act of this

sort."[10] *Napp*, 159 So. 2d at 166. This Court, relying upon *Billups Petroleum* and the cases

cited therein, disagreed and found that the "foreseeability of such an act" is not the applicable

test. *Id*. Rather, in reversing and remanding for a new trial, this Court held that "*the agent*

---

[10]The subject action was that the agent was to deliver a $2,000 check from the
defendant-life insurance company to Napp, but instead the agent made misrepresentations
resulting in only $1,000 being received by Napp, with the agent receiving the remaining
$1,000. *See Napp*, 159 So. 2d at 165-66.

19

*paid less than he was supposed to pay. If the appellant's testimony be accepted as true, then the company has not paid its debt.*" **Id**. (emphasis added).

¶33. Subsequently, the Fifth Circuit addressed **Billups Petroleum** and aptly stated that:

> [c]ontrary to some of the language in the . . . case, *the principal's liability is based on the theory embodied in §§ 219(2)(d) and 261 of the Restatement, rather than traditional "scope of employment" liability contained in § 219(1).* The four cases the **Billups** [**Petroleum**] court discusses in support of its holding evidence that the court imposed § 219(2)(d) liability. Each of the four cases involves fraud by an agent upon the principal's customer. *Each case involved a situation in which the principal delegated to the agent the power to perform a certain task, such as collect monies for the principal. In each case, the agent acted for his own purposes, but the fraud transpired as part of the very duty that the principal authorized the agent to perform. Because the customers had a relationship with the principal that induced the customers to rely on the principal's agent, and the agent defrauded the customers in the performance of the duty entrusted to him by the principal, the agent was "aided in accomplishing the tort by the existence of the agency relation*."

**Entente Mineral**, 956 F.2d at 529 (quoting Restatement (Second) of Agency § 219(2)(d))

(emphasis added). In sum:

> [t]he *proper inquiry* for determining vicarious liability of a principal whose agent defrauds the principal's customer *is the relationship between the principal and the customer*. In **Billups** [**Petroleum**], the four cases it discusses, and **Napp**, the principal had a relationship with the customer and the customer was defrauded by the principal's agent. The courts reasoned that *a principal who provides his agent with the tools or position necessary to perpetrate a fraud on the principal's customers, should be held responsible to the innocent customers who relied on the agent.*

**Entente Mineral**, 956 F.2d at 529 (emphasis added). *See also* **Jones**, 940 So. 2d at 967; **Hardwicke v. American Boychoir School**, 902 A.2d 900, 920 (N.J. 2006); **Doe**, 853 A.2d at 57; **Forum Fin. Group v. President and Fellows of Harvard Coll.**, 173 F. Supp. 2d 72, 101 (D. Maine 2001).

20

¶34. Golden Triangle acknowledges that it administered the HOME program. Golden Triangle then delegated to Tate, as housing specialist for the HOME program, the power to perform the following tasks, *inter alia*: advertising and soliciting bids from third-party contractors to construct homes; receiving invoices from contractors; reviewing inspector reports certifying the percentage of work completed on individual homes; and requesting cash allotments from counties and municipalities, which were paid with HOME funds.[11]

¶35. In the course of performing her tasks, which she was authorized by Golden Triangle to perform, Tate "acted for [her] own purposes . . . ." *Id*. While this "was the tort of the agent, as between him and his principals," there is also a genuine issue of material fact as to whether it "was the tort of both, as between them and the plaintiff." *Cleaney*, 51 So. at 952. If Akins can prove that he "had a relationship with [Golden Triangle] that induced [him] to rely on [Golden Triangle's] agent, [Tate,] and [Tate] defrauded [Akins] in the performance of the duty entrusted to [her] by [Golden Triangle]," *Entente Mineral*, 956 F.2d at 529, I conclude that genuine issues of material fact exist regarding whether Tate was "aided in accomplishing the tort by the existence of the agency relation." Restatement (Second) of Agency § 219(2)(d) (1958). As such, the trial court erred in granting Golden Triangle's motion for summary judgment. Therefore, I respectfully dissent.

**DICKINSON, LAMAR AND CHANDLER, JJ., JOIN THIS OPINION.**

---

[11]According to Count 47 of the indictment against Tate, to which she pleaded guilty, the HOME funds "were in the care, custody, and control of" Golden Triangle.